```
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA      )
                              )
           v.                 )    CRIMINAL NO. 03-10357-NG
                              )
WILLIAM CABAN                 )
```

### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant, William Caban, hereby moves this Court to suppress the fruits, including statements and physical evidence, of a search conducted pursuant to a warrant at 61 Ceylon Street, Apartment 1, Dorchester, on October 29, 2003.  As grounds for this motion, defendant states as follows:

1.)  The search warrant was not based upon probable cause, because the supporting affidavit failed to establish a nexus between the place to be searched and the items to be seized.

2.)  The agents executed the search warrant unlawfully because they failed to adequately knock and announce themselves before they broke through the apartment's door.

3.)  Defendant's arrest in the basement unit of 61 Ceylon Street was unlawful, because the agents had neither a search warrant for the basement nor permission to be there.

4.)  Defendant's statements made subsequent to his arrest were involuntary.

FACTUAL BACKGROUND

On October 28, 2003, ATF Special Agent Richard Donahue applied for, and received, a federal search warrant for 61 Ceylon Street, Apartment 1, in Dorchester. Copies of the application, the supporting affidavit, and the warrant are attached as Exhibit A.

The warrant application described 61 Ceylon Street as a three-story residence containing three apartments, one on each floor.[1] The affidavit alleged that defendant lived at the targeted residence, Apartment 1. The affidavit further alleged that, within the past four weeks, a confidential informant had been sitting on the front porch of the building with defendant and several other unidentified men. The informant observed defendant and another individual go into Apartment 1. When the two emerged, defendant was carrying three guns and the other individual was carrying a box of narcotics. Defendant passed two of the guns to other individuals and kept one for himself. The group went down to the basement, where they began packaging what the informant believed to be crack cocaine.

The search warrant was granted by Magistrate Judge Dein. The warrant authorized the seizure of firearms and firearm-

---

[1] The description failed to mention that the building also has a basement unit.

related items, as well as documents related to occupancy of the premises.  The search warrant did not authorize the search or seizure of defendant.  Agent Donahue had no warrant for defendant's arrest.

The search warrant was executed by ten ATF agents and three Boston police detectives on October 29, 2003 at 6:15 a.m. According to Agent Donahue's grand jury testimony of October 30, 2003, attached as Exhibit B, the agents knocked on the door, waited 10-12 seconds, then burst through the door with a battering ram.  Exhibit B at 17.

In fact the agents may have waited a briefer period than the 10-12 seconds claimed by Agent Donahue.  Defendant's brother, Carlos Caban, was called to testify before the grand jury.  His testimony is attached as Exhibit C.  Carlos Caban stated that on the morning of the search he heard a "hard" knock, went to the door, unlocked it, but before he could open the door, the door flew open, narrowly missing his head.  Exhibit C at 8, 19.

A total of eight agents, in riot gear and with guns drawn, made the initial entry into the apartment.  Exhibit B at 20. They first encountered Carlos Caban, who was to the immediate right of the front door in the living room.  Id. at 18.  Carlos Caban was thrown to the ground and handcuffed.  Id.; Exhibit C at 7-8.  The agents then encountered defendant's 58-year-old mother, Carmen Sanchez, whom they held at gunpoint.  Id.; Exhibit C at

10.  Finally, agents burst into the bathroom, where they found defendant's sister, Claudia Caban, taking a shower.  <u>Id</u>.; Exhibit C at 11; <u>see also</u> 10/30/03 grand jury testimony of Claudia Caban, attached as Exhibit D, at 10.  Defendant was not in the apartment.  Defendant's three family members were brought into the living room as the agents began the search.  Exhibit C at 11.

Meanwhile, upon learning that defendant was not in Apartment 1, several of the search team went downstairs to the basement unit.[2]  Exhibit B at 2.  According to Agent Donahue, they knocked, and were allowed into the unit by an individual named Tony Bruno.  <u>Id</u>.  They asked Bruno whether anyone else was in the unit; Bruno pointed to a closed door and said, "the landlord's kid sleeps in there."  <u>Id</u>.  They knocked on that door and defendant answered.  <u>Id</u>.

According to an affidavit submitted by Mr. Bruno, attached as Exhibit E, he never consented to the agents' entry into the basement unit.

Once the agents located defendant, they interrogated him in an attempt to find out where the guns were hidden.  The government's version of that interrogation is set forth in a letter from the government to undersigned counsel, attached as Exhibit F.  As the interrogation commenced, Agent Donahue

---

[2] The agents had specifically declined to seek a warrant for the basement.  <u>See</u> Exhibit B at 23.

threatened to tear the house apart if defendant did not tell them where the guns were.  Exhibit F at 1.  Defendant told them to "go ahead and tear the house apart."  Id.  Agent Ball then radioed upstairs, "Go ahead and tear it up.  He doesn't care."  Id.  Donahue then told defendant, "Let's handle this like adults.  Why not be a man about this."  Id.  Boston detective Wright told defendant he could save his family a lot of heartache if he just showed the agents where the guns were.  Id.  Defendant still maintained his silence.  Id.

> Detective Wright recalls then saying to defendant:
>
> Look this thing's bigger than you, we're here for a reason. These guys [the federal agents] didn't just pop up here.

Id. at 2.  To this, Boston detective Bullman added:

> This doesn't have to go federal.  Firearms [found] in a house at the state side [in state court] isn't even a felony.  You don't even have to get arrested, you could get summoned on the state side.

Id.  Agent Donahue then said, "William, this is getting ridiculous, let's do this," at which point defendant finally broke his silence and said "alright."[3]  Id.  Defendant retrieved a set of keys from the bedroom, and then led the agents upstairs into Apartment 1 and to a locked hallway closet.  Id.

---

[3] The government says that defendant remained stoic throughout the interrogation, which they claim lasted approximately five minutes.

5

Once upstairs, defendant handed Agent Donahue a key which Donahue used to open the closet.  See Agent Donahue's Report of Investigation (11/12/03), attached as Exhibit G, at 2, ¶ 7. Donahue asked defendant where the guns were.  Id.  Defendant pointed to a green jacket and said, "It's in there."  Id. Defendant was then placed in handcuffs and led to the kitchen. Id.  Agent Donahue looked in the green jacket and found approximately 50 grams of powder cocaine, a loaded .22 pistol, loose ammunition, and $750.00.  Id.  Donahue then went to the kitchen and asked defendant whether there were any other guns in the closet.  Id.  Defendant said there were not.  Id.

Agent Donahue searched the closet further and found a pouch containing three additional loaded handguns.  Id. at ¶ 8.  He also found a size 7 shoe, inside of which he found a sock containing $3700.00.  Id.  Other items found in the closet include a bag of loose ammunition, legal papers with defendant's name on them, and defendant's Charlestown High School ID card.[4] Id. at ¶ 10.

Donahue claims that after he found the $3700.00 inside the size 7 shoe, he obtained defendant's consent to search the

---

[4] The seizure of the evidence found in the closet yielded the instant indictment, which charges:  felon in possession of a firearm (18 U.S.C. § 922(g)(1))(Count 1); possession of cocaine with intent to distribute (21 U.S.C. § 841(a)(1)(C))(Count 2); and possession of a firearm in furtherance of drug trafficking (18 U.S.C. § 924(c))(Count 3).

basement bedroom.  Id. at ¶ 9.  In that bedroom Donahue found between seven and ten pairs of size 7 or 8 shoes, as well as defendant's Massachusetts state ID card.  Id.

After the search, defendant was questioned by Agents Donahue and D'Ambrosio and detective Bullman.  Id. at ¶ 13.  Defendant made several incriminating statements regarding the evidence seized.  Id.  In sum, defendant said that he had purchased the four firearms in the summer of 2003 from different men, and that he had a connection in Boston who sold him cocaine.  Id.

ARGUMENT

A.   THE SEARCH WARRANT LACKED PROBABLE CAUSE.

A search warrant application must establish probable cause that "(1) a particular person has committed a crime (the 'commission' element), and (2) enumerated evidence of the offense will be found at the place to be searched (the 'nexus' element)." United States v. Beckett, 321 F.3d 26, 31 (1st Cir. 2003)(citing United States v. Zayas Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996)).  "Under the 'probable cause' standard, the 'totality of the circumstances' disclosed in the supporting affidavit must demonstrate 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Zayas Diaz, 95 F.3d at 111 (quoting Illinois v. Gates 103 S.Ct. 2317, 2332 (1983)).

The warrant application in this case founders on the "nexus" element.  First, Agent Donahue's affidavit is hardly conclusive as to whether the firearms observed by the CI actually came from Apartment 1.  Although the affidavit asserts that the CI saw defendant and another individual go into Apartment 1 and return with three guns (carried by defendant) and a box of narcotics (carried by the other individual), the CI did not actually see defendant and the other individual retrieve these items from inside the apartment.  In an attempt to cure this deficiency, the affidavit goes on to say that when the CI observed defendant and the other individual go into the apartment, they were "empty-handed, and were not carrying bags."  Affidavit (Exhibit A) at ¶ 6.  That assertion, however, does not preclude other equally plausible scenarios for the source of the firearms.  For example, the other individual could have been carrying the guns on his person (the affidavit is silent with respect to the type of clothing worn by the men), and handed them over to defendant inside the apartment.

Assuming, however, that a fair inference may be drawn that the weapons came from inside Apartment 1, the affidavit suffers from a more serious flaw with respect to the nexus element.  The affidavit states that after the CI saw defendant and the other individual come out of Apartment 1, the group of men went down to the basement and began packaging crack cocaine.  There the story

abruptly ends. The affidavit contains no information whatsoever regarding what happened with the firearms next. Perhaps the guns were taken back upstairs to Apartment 1. But perhaps they were each taken home by three of the unidentified individuals sitting at the table; or perhaps they were passed on to one of the unidentified individuals for safekeeping; or perhaps they were hidden in the basement. The problem is that each of these scenarios, as well as any number of others, are equally plausible, and one cannot say that there existed a "fair probability" that the guns were returned to Apartment 1 (if that is, in fact, where they came from in the first instance).

Since the warrant application failed to establish probable cause that firearms and ammunition would be located in Apartment 1, the warrant was unlawful. Moreover, since the warrant application so glaringly failed to establish a nexus between the place to be searched and the items to be seized, the good faith exception established by <u>United States v. Leon</u>, 468 U.S. 897 (1984) does not apply.

B.  THE SEARCH WAS EXECUTED UNLAWFULLY BECAUSE THE AGENTS FAILED TO ADEQUATELY KNOCK AND ANNOUNCE THEMSELVES BEFORE BREAKING THROUGH THE DOOR.

Determining whether the knock and announce requirement was reasonably implemented in a given case requires an examination of the totality of the circumstances as they were known to the agents at the time the search warrant was executed. <u>See</u> <u>United</u>

9

States v. Banks, 124 S.Ct. 521, 525 (2003); Richards v. Wisconsin, 117 S.Ct. 1416, 1421-22 (1997).

In order to dispense with the knock and announce requirement, or to abbreviate the reasonable waiting period, the police must have "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 117 S.Ct. at 1421.

Here, Agent Donahue testified before the grand jury that the agents did knock and announce, then waited 10-12 seconds before breaking through the door with a battering ram. Defendant seeks an evidentiary hearing to confront that testimony. Assuming arguendo, however, that the agents in fact waited 10-12 seconds before entering forcibly, such a brief wait was unreasonable under the circumstances known to the agents in this case.

As an initial matter, the agents here cannot legitimately claim that they were concerned with the destruction of evidence. Unlike drugs, firearms cannot be easily flushed or disposed of in the sink. To the extent that the firearms could be thrown out a window, Agent Donahue wrote in his report that four officers remained outside the house to secure the premises while an entry team executed the warrant. See Exhibit G at 1, ¶ 3.

Nor could the agents claim that waiting longer than 10-12 seconds would be "futile." Nowhere does the evidence suggest that the agents developed a suspicion that someone was inside the apartment, but refusing to come to the door.

Finally, the agents cannot, in the context of this case, credibly claim the exigency of danger. While it is true that the agents were seeking firearms and ammunition, which are arguably inherently dangerous items, that fact alone does not support the abbreviated wait here. See Richards v. Wisconsin, 117 S.Ct. at 1421 (rejecting a categorical exception to the knock and announce requirement in drug cases, saying "If a per se exception were allowed for each category of criminal investigation that included a considerable--albeit hypothetical--risk of danger to officers or destruction of evidence, the knock and announce element of the Fourth Amendment's reasonableness requirement would be meaningless").

Put simply, the agents should have waited the additional brief moment it would have taken for Carlos Caban to open the door. To have done otherwise violated the knock and announce requirement, and rendered the search warrant execution in this case unreasonable.

C.   THE EVIDENCE MUST BE SUPPRESSED AS THE FRUITS OF DEFENDANT'S UNLAWFUL ARREST.

In Payton v. New York, 100 S.Ct. 1371 (1980), the Supreme Court held that police must first obtain an arrest warrant before entering a suspect's home to effect a routine felony arrest.

Here, the agents did not obtain an arrest warrant for defendant, or a search warrant for the basement unit at 61 Ceylon Street. Although the agents claim that they received consent to enter the basement from Tony Bruno, Mr. Bruno disputes that he gave consent. Absent consent, the agents' entry into the basement unit, and their subsequent arrest of defendant there, was unlawful under Payton.

Defendant's statements given in the aftermath of his arrest, and the physical evidence seized as a result of defendant's leading the agents to the closet, must be suppressed as fruits of the unlawful arrest. Wong Sun v. United States, 83 S.Ct. 407 (1963).

D.   THE EVIDENCE MUST BE SUPPRESSED AS FRUITS OF DEFENDANT'S COERCED AND INVOLUNTARY STATEMENTS.

Fruits derived from involuntary statements must be suppressed. United States v. Patane, ___ S.Ct. ___, 2004 WL 1431768, *5 (2004)("We have repeatedly explained 'that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent

criminal trial.'")(quoting Chavez v. Martinez, 123 S.Ct. 1994, 2002 (2003)).

In deciding whether a defendant's statements were coerced rather than the product of free will, a court must consider the totality of the circumstances. See Arizona v. Fulminante, 111 S.Ct. 1246, 1251 (1991); see also United States v. Flemmi, 225 F.3d 78, 92 (1st Cir. 2000)(citing United States v. Walton, 10 F.3d 1024, 1028 (3rd Cir. 1993)). The government bears the burden of proving that a defendant's statements were voluntary. See, e.g., United States v. Swint, 15 F.3d 286, 289 (3rd Cir. 1094).

The facts of this case reveal coercion. Here, the agents made emotional appeals to defendant to spare his mother the heartache of a search of the entire apartment, and to "be a man" about his predicament. More importantly, when those tactics failed, defendant was promised that if he cooperated, he would be summoned to state court to face misdemeanor charges (rather than arrested on the federal gun prosecution that the federal search warrant obviously portended). That this particular entreaty was made by Boston police detectives, whose cases are routinely prosecuted in state rather than federal court, underscores the coercive nature of the promise.

The fact that the agents made defendant this unfulfilled promise does not in itself render defendant's statements

13

involuntary; the court must still look to the totality of the circumstances. See United States v. Walton, 10 F.3d at 1028. However, the unfulfilled promise may properly be considered the dominant factor in the "totality of the circumstances" analysis here. Id. at 1030. The question is whether, in view of the surrounding circumstances, defendant's statements were obtained because the promise not to federally prosecute otherwise overbore defendant's free will. Id. at 1029.

The circumstances of this case indicate precisely that. Defendant, who according to the agents remained stoic during their emotional appeals to him to disclose the location of the firearms, relented only after he was promised he would not be prosecuted in federal court. At that point his will was overborne, and his subsequent statements were involuntary. Consequently, his statements, and the physical evidence derived from them, must be suppressed. Wong Sun v. United States, 83 S.Ct. 407 (1963).

## CONCLUSION

For the foregoing reasons, defendant's motion should be allowed.

## RESERVATION OF RIGHT TO AMEND/SUPPLEMENT MOTION

Defendant respectfully reserves the right to amend or supplement this motion in response to the government's reply. Further, defendant specifically reserves the right to seek

discovery and pursue a hearing pursuant to Franks v. Delaware, 98 S.Ct. 2674 (1978), should ongoing investigation reveal such action appropriate.

## REQUEST FOR EVIDENTIARY HEARING

Defendant requests an evidentiary hearing on this motion.

> WILLIAM CABAN
> By his attorney,
>
> /s/ J. Martin Richey
>
> J. Martin Richey
>   BBO# 559902
> Federal Defender Office
> 408 Atlantic Ave., 3rd Floor
> Boston, MA  02210
> Tel: 617-223-8061