EXHIBIT A

# UNITED STATES DISTRICT COURT

———————————————— DISTRICT OF MASSACHUSETTS ————————————

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

61 Ceylon Street, Apartment #1
Dorchester, Massachusetts

**SEARCH WARRANT**

CASE NUMBER: 03-H-1156-J6D

TO: _____ ATF Special Agent Richard Donahue _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ ATF Special Agent Richard Donahue _____ who has reason to

Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

See Schudule A Attached

in the _____ District of _____ Massachusetts _____ there is now

concealed a certain person or property, namely (describe the person or property)

See Schedule B Attached

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this
warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ 11-06-2003 _____

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to _____ UNITED STATES MAGISTRATE JUDGE JUDITH G. DEIN

as required by law.                                           U.S. Judge of Magistrate Judge

10/28/03      5:55 pm

Date and Time Issued                                    at   Boston, MA
                                                              City and State

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

Name and Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

_____ DISTRICT OF MASSACHUSETTS

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

61 Ceylon Street, Apartment #1
Dorchester, Massachusetts

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: 03-H - 1156 -JGD

| | Richard Donahue | | being duly sworn depose and say:

I am a(n) _____ ATF Special Agent _____ and have reason to believe
Offical Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

61 Ceylon Street, Apartment #1, Dorchester, Massachusetts

See also Schedule A Attached

in the _____ District of _____ Massachusetts

there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Schedule B Attached

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence of a crime

concerning a violation of Title _____ 18 _____ United States code, Section(s) _____ 922(g)(1) _____ .
The facts to support a finding of Probable Cause are as follows:
See attached affidavit

Continued on the attached sheet and made a part hereof.

☒ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

10/28/03
Date

at    Boston, Massachusetts
City and State

Judith G. Dein, U.S. Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

03-H-1106-JGD

## AFFIDAVIT OF RICHARD W. DONAHUE

I, Richard W. Donahue, being duly sworn, do state that:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed for approximately two and a half years. Prior to being employed by ATF, I was an agent with the United States Border Patrol for approximately four years. I am currently assigned to work with other federal, state, and local law enforcement agencies in a task force effort focusing on federal firearms, explosives and narcotics violations. Since joining ATF, I have participated in over thirty investigations involving the unlawful possession of firearms. Based on my training and experience as an ATF Special Agent, I know that it is a violation of Title 18, United States Code, Section 922(g)(1) for any person who has been convicted of a felony offense to possess any firearm or ammunition in or affecting commerce, or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

2. The information contained in this Affidavit is based on my personal involvement in this investigation, my training and experience, information provided to me by other law enforcement officers, and information provided to me by a confidential and reliable informant.

3. This affidavit is submitted in support of an application

1

for a warrant to search the first floor apartment of William

CABAN ("CABAN") at 61 Ceylon Street, Dorchester, Massachusetts,

for the items more particularly described below.

4.   I recently received information from a confidential

informant ("the CI") that William CABAN (DOB: 10/22/78), a

convicted felon, is in possession of a handgun.  The CI has

requested that his/her identity not be revealed for fear of

reprisal or harm to his/her physical safety.  The CI has provided

accurate, truthful, and reliable information in the past and

continues to do so to the present.  More specifically, the CI

provided reliable information to Boston Police Deputy

Superintendent Joseph Driscoll in his previous assignment with

the Drug Control Unit on numerous occasions over the past several

years.  On at least four occasions this information led to the

seizure of controlled substances and/or the arrest and conviction

of those in possession of the controlled substances.  Within the

last few weeks, the CI demonstrated his/her reliability by making

a controlled purchase of illegal drugs from an individual whom

the CI had previously identified as an individual who was selling

drugs.  The CI has a criminal record, including convictions for

violent crimes, larceny and narcotics violations.  The CI has

used narcotics and receives compensation for the information that

the CI provides to law enforcement.

5.   The CI told me that CABAN resides at his mother's

residence in Apartment #1 at 61 Ceylon Street in Dorchester,

Massachusetts. The CI described the building as a light blue, three level house and stated that Apartment #1 is located on the first floor. The CI said that the building also has a basement and that CABAN has full access to it.

6. According to the CI, within the past four weeks he/she was at 61 Ceylon Street, Dorchester, Massachusetts. The CI said that he/she was sitting on the front porch with CABAN and several other unidentified men. The CI followed CABAN through the front door of the house and waited in the hallway while CABAN and another man entered Apartment #1 on the first floor. The CI noted that CABAN and the other male entered the apartment empty-handed, and were not carrying any bags. A short time later, the CI said that CABAN and the other male returned to the hallway from Apartment #1. CABAN was carrying three handguns with him. He passed two of the guns to two other men and kept one for himself. The other male with CABAN exited Apartment #1 carrying a box which contained a large quantity of narcotics. The CI said that he/she followed CABAN and the other men down to the basement. Once in the basement, all three of the men with guns, including CABAN, placed the guns on a table that they were sitting at. At that point, CABAN, with the help of several of the other men, began to package what the CI believed was crack cocaine into small bags.

7. I have reviewed ten separate Boston Police incident

3

reports dating back to 1978.  In each of these reports CABAN'S home address is listed as 61 Ceylon Street in Dorchester, Massachusetts.

8.  Within the last two weeks I have spoken with an employee of N-STAR Electric regarding the electric service at 61 Ceylon Street.  The employee told me that the electric service to Apartment #1 at 61 Ceylon Street in Dorchester, Massachusetts, is listed to Carlos Caban and has been listed in that name since March, 1996.  It should be noted that on a Boston Police Arrest Booking Form dated June 15, 2001, CABAN listed his father's name as Carlos Caban.  N-STAR records also show that there is no electric service listed for Apartment #2 at 61 Ceylon Street. The electric service for Apartment #3 is listed to Luis Caban and has been listed in that name since February 2, 2003.

9.  I have reviewed records maintained by the Massachusetts Criminal History Systems Board and determined that CABAN, using an address of 61 Ceylon Street, Dorchester, Massachusetts, and providing a father's name of Carlos, has a criminal record.  An examination of CABAN'S criminal record reveals that on December 3, 1996, CABAN was convicted of possession of a class B controlled substance with intent to distribute in the Boston Municipal Court.  I know from my training and experience that this offense is a felony under Massachusetts law and that it carries a maximum penalty in excess of one year.

4

10. I know from my training, experience, and conversations with ATF Senior Special Agents that very few firearms are manufactured in the Commonwealth of Massachusetts. Furthermore, of the firearms which are manufactured in Massachusetts, a majority of them have been shipped to wholesalers or retail stores outside of Massachusetts and thus have affected interstate commerce at some time.

11. I know from my training and experience, and conversations with ATF Senior Special Agents that most people store their firearms in their homes and generally keep them for a period of time. The reasons for this are that firearms are expensive, they do not wear out easily, they are not consumed by use like narcotics, and they are somewhat difficult to acquire. This is especially true of persons who possess them unlawfully.

12. I also know from my training and experience and conversations with ATF Senior Special Agents that persons who possess firearms usually possess ammunition and often possess other items related to firearms, such as: gun cases, ammunition magazines, holsters, spare parts, cleaning equipment, photographs of firearms, and receipts for the purchase of these items.

13. Finally, I know from my training and experience and conversations with ATF Senior Special Agents that persons possess in their apartment residences documents which indicate their occupancy of the premises, such as, personal mail, identification

documents, correspondence, utility bills, rent receipts, financial documents, keys, photographs, and rental/lease agreements.

14.  I have personally observed the residence known as 61 Ceylon Street in Dorchester, Massachusetts. It is a three-story, light blue house. There is only one door in the front of the house, and the number "61" appears above the door. The CI explained to me that Apartment #1 is the only apartment located on the first floor. The door to Apartment #1 is located inside of the front, main entry door.

15.  Based upon all of the foregoing, there is probable cause to believe that William CABAN has violated Title 18, United States Code, Section 922(g)(1) (felon-in-possession of a firearm) and that evidence of that offense, as more specifically set forth in Schedule B attached to the application supported by this affidavit, is currently in his residence at Apartment #1 of 61 Ceylon Street in Dorchester, Massachusetts.

Richard W. Donahue
Special Agent
Bureau of Alcohol,
Tobacco, and Firearms

Sworn and subscribed to me this twenty-eighth day of October, 2003.

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

6

EXHIBIT A

*DESCRIPTION OF PROPERTY*

61 Ceylon Street, Apartment #1, Dorchester, Massachusetts

61 Ceylon Street is a three-story residence, light blue in color. The house contains three apartments, one on each floor. The main entrance is located in the front of the house. The number "61" appears above the door. Apartment #1 is the only apartment located on the first floor of the residence. The door to Apartment #1 is located off the first-floor landing, which is located directly inside of the main, front entrance.

EXHIBIT B

PROPERTY TO BE SEIZED

1) Guns, ammunition, gun cases, ammunition magazines, holsters, spare gun parts, gun cleaning equipment, photographs of firearms, receipts for the purchase of said items. These are the instrumentalities and evidence of crimes involving violations of Title 18, United States Code, Section 922(g)(1).

2) Documents and other items indicating occupancy of the premises, including personal mail, identification documents, correspondence, financial documents, keys, photographs, rental/lease agreements, and clothing or other personal items.

EXHIBIT B

1

I
1 - 25

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     VS.                    Case No.

JOHN DOE.

                      Federal Grand Jury
                      U.S. Courthouse
                      1 Courthouse Way
                      Boston, Massachusetts

                      Thursday
                      October 30, 2003

APPEARANCE:   MARIANNE HINKLE
              Assistant U.S. Attorney

WITNESS:     RICHARD DONAHUE

*APEX Reporting*
(617) 426-3077

2

## I N D E X

WITNESS                                                         PAGE

Richard Donahue

    Examination by Ms. Hinkle                              3

EXHIBITS   DESCRIPTION                                          PAGE

None

DONAHUE - 10/30/03                    3

1                    P R O C E E D I N G S

2                                          (11:10 a.m.)

3                    RICHARD DONAHUE, Sworn

4           EXAMINATION BY MS. HINKLE:

5      Q    Please, state your name and spell your last name

6  for the record?

7      A    Richard Donahue, D-O-N-A-H-U-E.

8      Q    And are you employed, sir?

9      A    Yes, I am.

10     Q    And where are you employed?

11     A    I'm a Special Agent with the United States Bureau

12 of Alcohol, Tobacco, Firearms and Explosives.

13     Q    And what, and how long have you been with the

14 Bureau of Alcohol, Tobacco, Firearms and Explosives?

15     A    Approximately two and a half years.

16     Q    And what are your responsibilities in your work as

17 an ATF agent?

18     A    We're currently assigned to Group 2, which is a,

19 we work primarily in the inner city enforcing all federal

20 firearms laws, so we work in a gun trafficking group.

21     Q    Now, as part of your responsibilities, Agent

22 Donahue, did you have occasion to become involved in the

23 execution of a search warrant, a federal search warrant,

24 that was actually executed in the early morning hours of

25 yesterday, which would have been October 29th?

                        *APEX Reporting*
                        (617) 426-3077

DONAHUE - 10/30/03                                    4

1      A    Yes, I did.

2      Q    And was that at 61 Ceylon Street, in Dorchester?

3      A    Yes, it was.

4      Q    Now, did you have other agents with you during the

5  execution of that warrant?

6      A    Yes.

7      Q    And what other agents were with you; what other

8  officers were with you?

9      A    I had approximately ten other ATF agents and four

10  Boston Police detectives with us.

11     Q    And approximately, what time did you execute this

12  search warrant?

13     A    6:15 in the morning.

14     Q    And can you describe, in a general way, what

15  61 Ceylon Street looks like from the outside?

16     A    61 Ceylon Street is a three-story, light blue

17  house.  There are one apartment on each of the three floors

18  and a basement, also.  There's only one door on the front of

19  the house with the number 61 clearly visible on top of it.

20     Q    And when, when you first went to execute this

21  warrant, what did you do?

22     A    There, the house, you gain access to the house

23  through a common door, the main door, which brings you into

24  a hallway.  Either you can go upstairs or you can, there's a

25  door for Apartment 1.  The main door was unlocked.  We made

APEX Reporting
(617) 426-3077

DONAHUE - 10/30/03                    5

1  entry into there.  We knocked and announced on Apartment 1,

2  identified ourselves as police, we had a search warrant,

3  open the door.

4       We waited what we believed was a sufficient amount

5  of time.  We heard no one inside.  No one came to the door.

6  We then forcibly entered the door by taking the door down

7  and, and made our entry into the apartment.

8       Q  Now, once you entered into the apartment, can you

9  describe or maybe you didn't notice at that time, but can

10 you describe what the layout of that apartment is once one

11 enters inside the interior?

12      A  Sure.  Upon entering the apartment, you're faced

13 with a long hallway that goes the length of the apartment.

14 As you step in, immediately to your right is a living room

15 area.  We had two team members enter the living room.  We

16 immediately encountered on individual.  The rest--

17      Q  And who was that individual?

18      A  That was Carlos Caban.

19      Q  And that's C-A-B-A-N?

20      A  Correct.

21      Q  So when you first saw Mr. Caban, he was in the

22 living room area?

23      A  Yes, he was.

24      Q  And did you then encounter anyone else in the

25 apartment or what is the rest of the layout--

*APEX Reporting*
(617) 426-3077

DONAHUE - 10/30/03                                    6

1        A    You continue going down the main hallway.  There

2   is a bedroom on the right.  We entered there, nobody there.

3   A bathroom on the left, that door was opened by an agent.

4   There was a female showering in there so the agent

5   immediately closed the door and let everyone else know to

6   hold that door, not to enter.

7             Moving on further down the hall, a second bedroom

8   on the right.  Directly in front of you, a kitchen and then,

9   lastly, a third bedroom on the right off of the kitchen.

10       Q    So there are, in a sense, three bedrooms in the

11  apartment, all on the righthand side--

12       A    Correct--

13       Q    --right after the other?

14       A    Four rooms in total, the first being the living

15  room, followed by three bedrooms.

16       Q    And you indicated you came into contact with

17  Carlos Caban?

18       A    Um-hum.

19       Q    Did you find, at some point, that the female who

20  was in the shower was actually a young woman named Claudia

21  Caban?

22       A    Yes, we did.

23       Q    And does the mother of Claudia and Carlos Caban

24  also live in that apartment?

25       A    Yes, she does.

DONAHUE - 10/30/03

7

1      Q    And is that woman's name Carmen Sanchez?

2      A    It is.

3      Q    And did you, at some point, find out, of those

4  three bedrooms you just told us about, which bedrooms

5  belonged to which of those individuals?

6      A    We did.  After things quieted down, and we had a

7  chance to talk with them, they identified which rooms were

8  theirs.

9      Q    And do you recall whose room was whose?

10     A    Yeah.  The first bedroom on the right belonged to

11  Carlos Caban; the second bedroom, Claudia Caban; and,

12  lastly, the third was to the mother, Carmen Sanchez.

13     Q    Now, was there also, is there also a basement, as

14  you said, in this house?

15     A    Yes, there is.

16     Q    And in speaking with the Cabans--

17     A    Um-hum--

18     Q    --did you ask where, if at all, a William Caban

19  was currently at that time?

20     A    Yes, I did ask.  They did not know, was their

21  answer, we're not sure.  I asked when was the last time they

22  saw him.  Again, they weren't sure.  I attribute that to

23  probably just the confusion and, and not knowing what's

24  going on and being a little scared.

25     Q    Did they indicate at any point where William

*APEX Reporting*
(617) 426-3077

DONAHUE - 10/30/03                    8

1   Caban's room was?

2        A    At that point, they did not.

3        Q    What happened next?

4        A    Two agents, the basement is accessible by two

5   ways, one through the downstairs kitchen and one from the

6   outside at the street level, there's a door.

7             Now, since we did not have a search warrant for

8   the basement, we didn't make an entry, a forcible entry, the

9   way we did to he apartment.  Instead, we had an agent knock

10  on the door from outside.  The door was opened, and the

11  agent was greeted by a gentleman who identified himself as

12  Tony.

13            Tony, they explained to Tony what was going on.

14  Tony said, come on in, get out of the rain.  It was raining

15  out.  Tony said that he's tenant downstairs, and he has a

16  small room in the basement.  We explained that we were

17  interested in looking for a William Caban.

18            Tony pointed to the door and said, oh, that's the

19  landlord's son, his bedroom is through that door.  Agents

20  went and knocked on that door.  The door was open.  William

21  Caban, or a gentleman identifying himself as William Caban

22  opened the door.

23        Q    So this is in the basement?

24        A    This is in the basement.

25        Q    So there are two separate rooms, if you will, in

DONAHUE - 10/30/03                                    9

1  the basement.  One was occupied by this individual--

2       A    Right--

3       Q    --named Tony?

4       A    Correct.

5       Q    And the other appeared to be occupied by William

6  Caban?

7       A    That's correct.

8       Q    Now, at some point, you indicated there was a

9  search warrant.  Was the search warrant for the first floor

10 apartment of 61 Ceylon Street?

11      A    Yes, it was.

12      Q    And at some point, did you have occasion to search

13 that first floor apartment?

14      A    Yes, we did.

15      Q    And in the course of your search, did you find any

16 particular items in that first floor apartment?

17      A    I did.

18      Q    And where, within the apartment, did you find

19 these items?

20      A    These items were found primarily in a, the long

21 hallway that I described to you, on the opposite side of the

22 bedrooms, there was a small locked closet door, probably

23 about 5 feet high by 4 feet wide, a very short door.  It was

24 in there that we found the majority of the items.

25      Q    And what items did you find in that closet?

DONAHUE - 10/30/03                                    10

1    A    We found four loaded firearms; we found a

2 significant amount of cocaine and approximately $4,700 in

3 cash.

4    Q    And where, within that closet, were those firearms

5 found?

6    A    We first encountered, hanging in the closet, a

7 green jacket, green men's jacket.  Inside the front pocket

8 of that jacket I found one firearm, miscellaneous

9 ammunition, a large bag of substance we believed to be

10 cocaine, and in the, another pocket in the same jacket, $750

11 in cash.

12         Extending our search further on into the closet,

13 there was a clothes basket, about a 3, 4 foot high clothes

14 basket, that appeared to be more of a storage bin.  Clothes

15 were folded neatly and piled up inside this.  I lifted off

16 three or four levels of clothes and found like a gun pouch,

17 a canvas bag that's normally used to hold firearms.  Inside

18 of that, I found three additional weapons.

19    Q    And were those loaded when they were found?

20    A    They were all loaded, correct.

21    Q    Do you remember what kinds, just calibers, of

22 firearms those were?

23    A    Off the top of my head, it was a, one was a

24 .22 caliber semiautomatic weapon; one was a .38 caliber

25 revolver; and the other two were .25 caliber semiautomatic

DONAHUE - 10/30/03                                    11

1    handguns.

2         Q    The other two, that meaning one in the clothes

3    basket and one in the pocket?

4         A    The one in the pocket was a .22 caliber weapon,

5    and then the three that I found together in the pouch, of

6    those three, we had one .38 caliber revolver and two

7    .25 caliber semiautomatics.

8         Q    Now, did you, did you find additional money in

9    that closet?

10        A    I did.  There was a shoe box in the closet,

11   Johnson and Murphy pair of shoes.  I took the shoe box out,

12   opened it.  There was a brand new pair of men's shoes, and I

13   knew they were new because the tag was still on them.  I

14   reached inside the shoes, and there was a sock.  Inside of

15   that sock rolled up was $3,700 in cash, primarily $100

16   bills.

17        Q    Now, did you also find items that you took in one

18   other location?

19        A    Yes, there was one other location.  The first

20   bedroom on the right, the one that I identified as Carlos

21   Caban's bedroom, in there, agents found, on top of the

22   dresser, there was a little tin, almost, maybe a candy dish

23   type of a tin, with a lot of different items in it, change,

24   a watch, just kind of filled up with miscellaneous things.

25             We found two small bullets inside of that as well,

DONAHUE - 10/30/03                                   12

1  two .22 caliber rounds, mixed in, again, with a lot of other

2  things.

3      Q    Now, when you found those .22 caliber rounds,

4  those two .22 caliber rounds, in that item on the top of the

5  dresser--

6      A    Um-hum--

7      Q    --was Carlos Caban, had you already allowed him to

8  leave for work?

9      A    We had.  He was completely cooperative with us,

10  and after approximately one hour, he explained that he had a

11  job to go to and asked if he could leave, and I allowed him

12  to.  We watched him dress.  You know, we went in and

13  accompanied him and let him leave.  It was only after that

14  that we found the two rounds of ammunition.

15      Q    Now, did you find any identification or papers or

16  anything like that in the closet where you found these other

17  items?

18      A    I did.  Among the items that I seized, one was a

19  high school identification card from Charlestown High School

20  with the name William Caban on it, no photo attached, and I

21  also found a number of different court documents for the

22  state of Massachusetts under the name William Caban.  These

23  were in the, in the closet in the hallway.

24      Q    Now, you indicated you had some conversation with

25  or that some agents had conversation with William Caban in

DONAHUE - 10/30/03                    13

1   the, in the basement?

2       A    Um-hum.

3       Q    At some point, did Mr. Caban accompany the agents

4   up to the first floor apartment?

5       A    Yes, he did.  This, backing up, was prior to us

6   searching this closet and finding contraband.  William Caban

7   invited agents into his downstairs bedroom without being

8   asked.  I believe his words were, hey, come on in, you can

9   check here, if you want.

10          We walked in and did not start searching.  I like

11  to get a written consent of search before we start that,

12  which I later did achieve.  However, I had a conversation

13  with Mr. Caban.  I explained to him that we were here to

14  find, to find guns, and I told him that I knew there were

15  guns in the house and that, if he did not show me where the

16  guns are, then we'd have to search the house.

17          I told him his mother was very upset upstairs, and

18  having people go through her personal things, which is

19  current procedure, that that's going to be heart-wrenching

20  to her, and, you know, he needed to step up and show us were

21  the guns were to prevent that from happening.

22          After mulling that over for a few minutes, he

23  decided, okay, I'll show you.  Stood up, grabbed a set of

24  keys that he had next to his bed in the basement and led us

25  upstairs, led us directly to the closet, handed me the key.

DONAHUE - 10/30/03                    14

1   I opened the closet.  He pointed to the green jacket and

2   said, "In there."

3         It's at that point that I handcuffed him for

4   everyone's safety and, and began the search that I talked

5   about earlier.

6      Q    Was there further conversation that took place

7   with Mr. Caban prior to him getting the key and bringing it

8   upstairs with the agents?

9      A    To the best of my knowledge, the only conversation

10  with Caban was in the basement and consisted of us trying

11  to, trying to get him to tell us where the guns were so we

12  didn't have to find them ourselves, for a number of

13  different reasons.

14         MS. HINKLE:  Do the grand jurors have any

15  questions for this agent?

16         GRAND JUROR:  I have a question.  Do you still

17  search the apartment after you--

18         THE WITNESS:  You know, we made the decision that

19  because we found the guns and because he showed us there, we

20  decided to only search that closet and the brother's

21  bedroom, the reason being there were, there were men's

22  clothes in there, and we wanted to search that room.

23         We left, we did not do an extensive search of the

24  mother's room, the kitchen, the living room or the sister's

25  room.  Did a cursory search, walked in and looked around

DONAHUE - 10/30/03                                    15

1   and looked under things and whatever, but we did not do a

2   normal search.

3            GRAND JUROR:  And were you looking for any

4   particular guns?

5            THE WITNESS:  I had information that there were

6   three particular weapons in the house.  As it turned out,

7   the three I had mentioned that were found together, those

8   are the three I was looking for.

9            GRAND JUROR:  Is it common, I'm sorry--

10           MS. HINKLE:  Go ahead--

11           GRAND JUROR:  --to send so many, ten agents, plus

12  four cops?

13           THE WITNESS:  Absolutely, yes, especially when you

14  believe there will be guns involved and, and violent people.

15           GRAND JUROR:  The basement part, you didn't have a

16  search warrant for?

17           THE WITNESS:  That's correct.

18           GRAND JUROR:  So because he said you could come in

19  an look, anything you would have, if you had found anything,

20  it would have been like a legal search?

21           THE WITNESS:  Yeah.  That's him giving us consent

22  to search.  Like I said, I, and the ATF's policy is, let's

23  get written consent first to cover our backs.  I did get

24  written consent, and we, eventually, did search the basement

25  apartment--

DONAHUE - 10/30/03                                      16

1       GRAND JUROR:  Did you -- go ahead--

2       THE WITNESS:  --after getting that written

3  consent.

4       GRAND JUROR:  Did you find anything in his room?

5       THE WITNESS:  We found some cash and a few things

6  of note.  After I found the money in the shoe upstairs, I

7  noticed that the shoes were size 7 men's shoes.  I went

8  into the brother's room, asked him what size shoe he wore,

9  and he said size 11.

10      There were two pairs of shoes in there, and there

11 were two pairs of size 11 shoes.  I went downstairs, during

12 the search of the basement, and noticed about ten to twelve

13 pairs of shoes in William Caban's room, and they all ranged

14 from size 7 to 8, which led me to believe that the shoes in

15 the, in the closet were either his or someone else that

16 wears a size 7 shoe.

17      MS. HINKLE:  Do the grand jurors have any

18 additional questions for this witness?

19      (No response.)

20      GRAND JUROR:  Thank you for coming in.

21      (Witness leaves Grand Jury room at 11:26 a.m.)

22      (Witness returns to stand at 12:01 p.m.)

23      GRAND JUROR:  I'll just remind you that you're

24 under oath.

25      MS. HINKLE:  Agent Donahue, you were previously

APEX Reporting
(617) 426-3077

DONAHUE - 10/30/03                    17

1    sworn.

2                 THE WITNESS:  Yes.

3                 MS. HINKLE:  A number of the grand jurors have

4    questions for Agent Donahue.

5                 GRAND JUROR:  You, when you were in here

6    previously, said that you knocked on the door and announced

7    the search warrant?

8                 THE WITNESS:  Um-hum.

9                 GRAND JUROR:  You waited a sufficient amount of

10   time--

11                THE WITNESS:  Um-hum--

12                GRAND JUROR:  --and then you entered the apartment

13   by removing the door?

14                THE WITNESS:  Correct.

15                GRAND JUROR:  Can you clarify for the Grand Jury

16   what that sufficient amount of time was?

17                THE WITNESS:  We waited, Supreme Court hasn't

18   decided what is a sufficient amount of time.  Five second

19   has sometimes been mentioned.  Yesterday, we waited an

20   unusually long, ten to twelve seconds, which is a lifetime

21   when you're standing in front of that door, but we did give

22   it extra time.

23                GRAND JUROR:  Okay.  And is that the, how long you

24   usually wait in the usual course--

25                THE WITNESS:  Usually, we go quicker than that.

1    GRAND JUROR:  Okay.

2    THE WITNESS:  Usually, it's closer to five

3  seconds.

4    GRAND JUROR:  And you said you removed the door

5  from the hinges?

6    THE WITNESS:  No.  I think I said we took the door

7  down.  We used what's called a ram to--

8    GRAND JUROR:  Okay--

9    THE WITNESS:  --basically, bang the door in.

10    GRAND JUROR:  Okay.  And can you clarify for us,

11  again, what happened when you first entered the apartment,

12  who you encountered, if you physically approached him--

13    THE WITNESS:  Um-hum--

14    GRAND JUROR:  --what you said to him?

15    THE WITNESS:  The first individual we encountered

16  was on the right in the living room.  It was Carlos Caban.

17  He was ordered to the ground and handcuffed.  We didn't know

18  who he was, of course.  Directly down the hallway, Carmen

19  Sanchez was there.  We called her out, sat her down in the

20  living room.  She was not handcuffed.  And we encountered

21  the, the woman in the bathroom.  One of the agents opened

22  the door, saw that she was showering, shut the door

23  immediately and made an announcement to not enter the room

24  and to hold the door.

25    GRAND JUROR:  Okay.  So that officer, to the best

DONAHUE - 10/30/03                          19

1   of your knowledge, were you, did you visually see that

2   happen or did you just learn that it happened--

3               THE WITNESS:  I was right behind him when it

4   happened.

5               GRAND JUROR:  You were behind him, so to what you

6   saw, he closed the door, himself, after he saw--

7               THE WITNESS:  Yes, he did--

8               GRAND JUROR:  --that she was in there?

9               THE WITNESS:  Yes.

10              GRAND JUROR:  Okay.  And when the mother was

11  approached, she was approached with a firearm, a drawn

12  firearm?

13              THE WITNESS:  Absolutely.  That's the way it's

14  done.

15              GRAND JUROR:  Okay.

16              MS. HINKLE:  Additional questions for Agent

17  Donahue?

18              GRAND JUROR:  Yes.  Could you just explain that

19  protocol to us?  I think that we don't understand--

20              THE WITNESS:  Okay--

21              GRAND JUROR:  --the nuances of your job, so if you

22  could explain that protocol to us, I think that would be

23  helpful to us around the--

24              THE WITNESS:  Well, when we, we make an entry,

25  we're doing so because we think either there's contraband

1  there, a bad guy, a felon. Our number one goal is to not

2  get killed. Okay?

3          So we go in there with guns drawn. It's early in

4  the morning. It's dark. Two things sometime happen. They

5  hear us coming. They know it's the police. They want to

6  shoot it out. Or they hear someone coming in, and they

7  think they're being robbed. They want to shoot it out with

8  the robbers.

9          So we're going in with safety as the number one

10 priority, and that's why we use, we come in with rifles, we

11 come in with shields, bullet-proof shields, helmets, and

12 that's all until things de-escalate. Once things

13 de-escalate, I always make it a point to let them know why

14 we're here, they're safe, sit them down, explain to them,

15 but until that is, until that safety's ensured, we're going

16 to make sure we're careful.

17         GRAND JUROR: Thank you. That helps. Did all

18 fourteen of you enter through that front door?

19         THE WITNESS: Negative. When I say a fourteen-man

20 team, on this particular case, two had rear security in the

21 back yard, two stayed in the front. One agent was

22 responsible for staying in the common hallway and watching

23 the stairs to make sure nobody came downstairs, and the

24 entry was made with, I believe, seven other agents.

25         GRAND JUROR: You were there because you were

DONAHUE - 10/30/03                                21

1    looking for firearms; is that the case?

2            THE WITNESS:  That's correct.  I wrote a search

3    warrant for firearms.

4            GRAND JUROR:  You got a tip that there were

5    illegal firearms in--

6            THE WITNESS:  I did.  I had information telling me

7    that there were, in fact, guns and possibly drugs, but

8    primarily guns in that residence.

9            MS. HINKLE:  And the search warrant, in fact, was

10   for those firearms; is that--

11           THE WITNESS:  It was for firearms, bullets,

12   magazines, things that you would generally find with guns.

13           GRAND JUROR:  So you say you got a tip that there

14   were guns in there.  I'm sure you get tips, but not all the

15   time -- you're not going to find guns somewhere?

16           THE WITNESS:  That happens.

17           GRAND JUROR:  So do you sometimes believe the

18   people that tip you and--

19           THE WITNESS:  Well, the people, the people we use

20   as informants -- go ahead.

21           MS. HINKLE:  As a result -- the question I wanted

22   to ask, as a result of the information that you had--

23           THE WITNESS:  Um-hum--

24           MS. HINKLE:  --did you author an affidavit?

25           THE WITNESS:  I did.

DONAHUE - 10/30/03                    22

1      MS. HINKLE:  And did you include in that affidavit

2   the basic information that you had received from this

3   informant?

4      THE WITNESS:  Yes, I did.

5      MS. HINKLE:  And as a result of that, did this,

6   did the court, in fact, issue a search warrant for you to

7   search for these items--

8      THE WITNESS:  Yes--

9      MS. HINKLE:  --in that first floor apartment?

10      THE WITNESS:  Yes.

11      MS. HINKLE:  And was that the reason why you went

12   to 61 Ceylon Street having that search warrant--

13      THE WITNESS:  Yes.  A federal judge told us we

14   could and should, and that's why we went.

15      GRAND JUROR:  Question.  This all happened at

16   6:15.  When did you obtain the search warrant; is it the day

17   before, the night before?

18      THE WITNESS:  In this particular case, it was the

19   night before.  I had a judge sign it at 6:15 the night

20   before.

21      GRAND JUROR:  Is there a time frame on those

22   search warrants you have to execute it--

23      THE WITNESS:  Yeah.  It's between, unless there

24   are extenuating circumstances, it's usually never before

25   6:00 a.m. and never after 10:00 p.m.

DONAHUE - 10/30/03                                    23

1        GRAND JUROR:  I see.  And why didn't you include

2   the basement; you knew there was a basement in the home?

3        THE WITNESS:  Right.  There were, there were, we

4   were not granted the basement, I should say.  The United

5   States Attorney's office decided that, in looking at the

6   evidence, it was more appropriate for us just to search,

7   just to apply for a search warrant for the first floor.

8        MS. HINKLE:  Did you know, when applying for the

9   search warrant, did you have any idea that William Caban was

10  sleeping in the basement?

11       THE WITNESS:  No, I didn't.  That would have made

12  a big difference in us being granted the basement.  We had

13  information saying that he was not sleeping down there, and

14  that's the reason we didn't get it.

15       MS. HINKLE:  Additional questions for this

16  witness?

17       GRAND JUROR:  Has it been determined if any of

18  these guns have permits to Mr. Caban?

19       THE WITNESS:  The investigation is currently on.

20  I can't go any further than that--

21       MS. HINKLE:  You're continuing to investigate--

22       THE WITNESS:  We're continuing to investigate

23  that, yes.

24       GRAND JUROR:  And the cocaine has been sent on its

25  way; correct?

DONAHUE - 10/30/03                    24

1          THE WITNESS:  The cocaine is currently at the

2   Boston Police, District 2.  Currently, in cases like this,

3   we'll give all narcotics to the local police and let them

4   process it.

5          MS. HINKLE:  And they arrange for testing of the--

6          THE WITNESS:  They did, absolutely.

7          MS. HINKLE:  Additional questions for this

8   witness?

9          (No response.)

10         MS. HINKLE:  Okay.

11         GRAND JUROR:  Thank you.

12         (Whereupon, at 12:06 p.m., October 30, 2003, the

13  witness was excused.)

14

15

16

17

18

19

20

21

22

23

24

25

25

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before:  __A FEDERAL GRAND JURY__

in the Matter of:

UNITED STATES OF AMERICA

VS.

JOHN DOE


Place: Boston, Massachusetts

Date:  October 30, 2003

were held as herein appears, and that this is the original

transcript thereof.

OFFICIAL REPORTER (Signature)
Jody L. Perkins

EXHIBIT C

1

I
1 - 21

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,

     VS.                    Case No.

JOHN DOE.

---

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Thursday
October 30, 2003

APPEARANCE:   MARIANNE HINKLE
                 Assistant U.S. Attorney

WITNESS:      CARLOS CABAN

*APEX Reporting*
(617) 426-3077

2

I N D E X

WITNESS                                                          PAGE

Carlos Caban

    Examination by Ms. Hinkle                                      4

EXHIBITS   DESCRIPTION                                           PAGE

None

CABAN - 10/30/03                    3

1                    P R O C E E D I N G S

2                                              (11:26 a.m.)

3                    CARLOS CABAN, Sworn

4            MS. HINKLE:  Mr. Caban, we met earlier today.  My

5    name's Marianne Hinkle, and I'd just like to read some

6    things to you before you testify, and you've already heard

7    most of this when we talked earlier; is that right?

8            THE WITNESS:  Um-hum.

9            MS. HINKLE:  You're testifying today before a

10   Federal Grand Jury, and the Grand Jury's conducting an

11   investigation of alleged violations of federal criminal law,

12   including felon in possession of a firearm.

13           Under the Fifth Amendment of the United States

14   Constitution, you have the right to remain silent and to

15   refuse to answer any question asked of you if a truthful

16   answer to that question might incriminate you.

17           As you can see, there's a court reporter here, and

18   everything you say is taken down in that microphone, and

19   anything that you say could be used as evidence against you

20   or other people in this or any other legal proceeding.

21           Are you represented by counsel today; do you have

22   a lawyer today?

23           THE WITNESS:  No.

24           MS. HINKLE:  And if at any time you decide you

25   wish to consult with a lawyer, you'll be given an

                        *APEX Reporting*
                        (617) 426-3077

CABAN - 10/30/03                                4

1    opportunity to do that.  I'll ask my questions very

2    carefully.  If you don't understand something I ask you,

3    please, just tell me, and I'll ask it a different way.  All

4    right?

5              THE WITNESS:  (No verbal response.)

6              MS. HINKLE:  Now, one thing, because it's a

7    microphone, Mr. Caban, you can't just shake your head, so

8    you have to say yes or no--

9              THE WITNESS:  Yes--

10             MS. HINKLE:  --to any questions I ask.

11             THE WITNESS:  I understand.

12             MS. HINKLE:  Thank you.

13             EXAMINATION BY MS. HINKLE:

14        Q    Now, Mr. Caban, what's your address?

15        A    61 Ceylon Street.

16        Q    In Dorchester?

17        A    Yes.

18        Q    And have you lived in that home for quite some

19   time?

20        A    Yeah.

21        Q    And do you live there now with your mother--

22             GRAND JUROR:  Excuse me.  We don't know his first

23   name--

24             GRAND JUROR:  We don't know his name.

25             MS. HINKLE:  Oh, I'm sorry.

                        *APEX Reporting*
                        (617) 426-3077

CABAN - 10/30/03                     5

1           BY MS. HINKLE:

2       Q    Mr. Caban, can you state your name--

3            GRAND JUROR:  He needs to be sworn in.

4            GRAND JUROR:  No, no.  He was.

5            GRAND JUROR:  He was?

6            GRAND JUROR:  He was sworn in.

7            GRAND JUROR:  Okay.  I missed that.

8            MS. HINKLE:  Yes.

9            BY MS. HINKLE:

10      Q    Could you state your name and spell your last

11  name?

12      A    My name is Carlos Caban.  What else?

13      Q    And spell your last name?

14      A    Oh, C-A-B-A-N.

15      Q    Now, you live at 61 Ceylon Street with your

16  mother?

17      A    Yes.

18      Q    And with your sister?

19      A    Yes.

20      Q    And with your brother William?

21      A    Yes.

22      Q    And do any other family members live in that first

23  floor apartment or the basement apartment?

24      A    Family, just me, my, my -- first, my mother live,

25  my sister and me live in the first floor, and he, my

APEX Reporting
(617) 426-3077

CABAN - 10/30/03                                6

1    brother, was living upstairs, and he moved downstairs.

2        Q    Into the basement?

3        A    Into the basement, yes.

4        Q    And is there another individual, a family friend--

5        A    Yeah--

6        Q    --named Tony who--

7        A    Yeah--

8        Q    --lives in the basement?

9        A    Yes, like a relative.

10        Q    Now--

11        A    Long time--

12        Q    --does someone else live in the second floor

13    apartment?

14        A    Yes.  I think Gus.

15        Q    Is that a renter?

16        A    That's different, different thing.  That's

17    different.  They, they pay rent.  That's a tenant, different

18    person.

19        Q    And the third floor?

20        A    That's different person, too.

21        Q    Also a tenant?

22        A    So that's, that's different, yeah.

23        Q    Now, the layout of your first floor apartment, can

24    you just tell us what room, as one comes in the front door

25    of your house--

1      A    The front door is the living room that goes right

2  there on the side, take a right, that's the living room

3  there.  You walk, that's the closet, closet there, then,

4  then you see the bathroom.  Then on the right side close to

5  the bathroom, the door, that's my room.

6      Q    That's your room?

7      A    Yeah.

8      Q    And then the next bedroom?

9      A    The next one's my sister, and the kitchen's right

10 there.  My mother's room is the next, but the kitchen's

11 right there with two entrance, my mother's room and my

12 sister's room.

13     Q    Now, can you get into the basement from the first

14 floor apartment?

15     A    Yes.

16     Q    And is there an outside door that takes you into

17 the basement?

18     A    Outside in the garage.

19     Q    Through the garage--

20     A    Yeah--

21     Q    --you can get into the basement?

22     A    Yeah.

23     Q    Now, were you home early yesterday morning when

24 the agents came to do the search warrant?

25     A    Yes, I was home.  They put a gun into my face and

CABAN - 10/30/03                                    8

1    all that.

2         Q    When they came in?

3         A    Yes.  They say get on the floor, and they handcuff

4    me, and get on the floor, get on the floor, and they put my

5    handcuffs so tight that I told, if I'm not arrested, why you

6    got me, you know, my handcuff on me, and I, I ain't got no

7    gun, so they put me on the floor, put like this and then put

8    me on the floor hard and, and--

9         Q    And handcuffed you--

10        A    --handcuffed me for no reason.  I didn't have no

11   gun or nothing.  I ain't did nothing.  I just did what I, I

12   was going to go, I heard the knock, unlocked the door and

13   almost, the door almost hit me when they pulled it, hit the

14   thing.  I almost, this much of breaking my forehead.

15        Q    So you heard the knock on the door?

16        A    Yeah, I heard them knock hard.  It was hard.

17   Anybody could hear this, so I got up, time I went to the

18   door, like this much, ka-boom.  You know what I'm saying?

19   And almost hit me in my, my, my face.

20        Q    And then they--

21        A    The door--

22        Q    --put you down on the floor?

23        A    They all went, go out, go out there, get in there

24   with -- the first guy had a big gun, so big, I don't know.

25   I don't know what type of gun was that there.  Got me

CABAN - 10/30/03                    9

1   nervous, you know what I mean, and imagine if I was so

2   nervous I do something, and he shoot me for no reason.  You

3   know what I mean?

4           And because, now, now, you know what I'm saying, I

5   was doing my job, and he, and, you know, sometimes you get

6   nervous, and you do something, you know, think that, they

7   think that you got a gun or something, and they shoot you

8   for no reason.  You know what I mean?

9       Q    But that didn't happen on--

10      A    No, that didn't happen, thanks to God.  You know

11  what I mean?

12      Q    So--

13      A    It didn't happen to me like that.

14      Q    So they, they put you down on the floor, and they

15  handcuffed you--

16      A    They put me down on the floor, they put me with

17  my, with, with the feet down like this, like that, and pull

18  myself down like this on the floor, and, and they handcuff

19  me, and one tied real tight that, my, my wrist sometimes

20  hurts.

21      Q    And then, at some point, did they take the

22  handcuffs off and let you stand up?

23      A    Yeah, because if I didn't told them nothing about

24  the handcuff, they would left it there on me.

25      Q    You told them they were too tight?

CABAN - 10/30/03                        10

1    A    Yeah, it was too tight.

2    Q    And then did they take them off?

3    A    And then they say, oh, we, then the other guy, I

4    don't know the names of the officers, was too many, told the

5    officer, oh, you can take his handcuffs off.  Then everybody

6    looked at each other, yeah, yeah, take them off; then, they

7    took them off.

8    Q    And did they let you stand up then?

9    A    They let me stand up and then let me back, sit

10   down again.

11   Q    Okay.

12   A    In a seat.

13   Q    And then, and then what did they do, Mr. Caban?

14   A    They went and point a gun to my mother.  She was

15   coming out the thing.  Well, one to me, one to my mother.

16   My mother have high blood pressure.  She got diabetic, she

17   diabetic person, and too bad she didn't faint or nothing.

18   They put a gun up to her, too, on her thing, and she, she

19   didn't know English, so imagine she do something, she don't

20   know English, they shoot her, too.  You know what I mean?

21   So, it's part of the search warrant, but, you know what I

22   mean, you got to be careful of, of thing.  I don't know how

23   to say that word.

24   Q    Now, at some point, did they allow your mother to

25   go about doing what she was doing?

CABAN - 10/30/03                          11

1      A      No.  Just come over, sit over here.

2      Q      In the living room?

3      A      My sister, they went and bust in my sister.  She

4   was taking a shower.  She was all naked, and they say, oh,

5   you don't care about this and that and that I'm naked.  No,

6   that's  too bad.  You know what I mean?  I'm like, wow, I

7   don't know, like too bad like this.  You know, and she's,

8   she's a she.  It would have been me, I don't care.  I'm a

9   man, but she's a she.  You know what I mean?  Even if it's a

10  raid or is a search warrant, a little respect, I respect

11  that.  You know what I mean?

12     Q      Did they close the door to the shower after they

13  had opened it?

14     A      Because I was over here, over here, and I can't

15  see the shower, not like that, but she came out mad, all you

16  cops, you don't care if I'm in the shower.  Nope.  They just

17  start scream at her, yo, you know, stop, stop, yelling at

18  her because she was nervous.  She was upset because, you

19  know what I'm saying, she -- a little privacy.  You know,

20  she, she go to work, and, you know, she ain't got do all

21  that stuff.

22     Q      Now, at some point, did they have you and your

23  mother and your sister sit in the living room?

24     A      Yeah, in the living room.

25     Q      While they conducted their search?

CABAN - 10/30/03                          12

1      A    Yeah, they conducted, go inside themselves and

2   they went to, I don't know where they went because I'm

3   inside there, I can't see from -- where they went.

4      Q    Now, at some point, you indicated where these

5   different rooms are in your, in your apartment, in the first

6   floor apartment.  Now, William was staying in the basement?

7      A    Yeah.

8      Q    And how long had William been staying in the

9   basement?

10     A    For me, he was in there for like a month.

11     Q    Now, so he'd been living down there for about a

12  month?

13     A    A month, yeah.

14     Q    Before William lived in the basement, or stayed in

15  the basement, where was William sleeping?

16     A    Upstairs in the living room.

17     Q    In the living room, that first room?

18     A    Yeah, that room right there when they busted the

19  door, right there's the living room right next, next door.

20     Q    And how long would you say had William been

21  staying in the living room?

22     A    A while.  I can't tell you how much, how long.

23  It's like he been there for a while, but sometimes I can't

24  keep track because I got too many things in my mind.  I

25  don't keep track of my -- if I live, I live, you know, and

*APEX Reporting*
(617) 426-3077

CABAN - 10/30/03                13

1   have a good time and that's about it.  I don't deal with--

2       Q    Before William stayed in the living room, where

3   did he stay?

4       A    Before in the living room, in my room.

5       Q    In your room?

6       A    Before, that's like two years ago.  I haven't seen

7   him since he been out, so -- and he was there, and he came

8   back, and he took all my stuff out of the room, and when he

9   came back, so he, I told him that he could probably sleep in

10  the living room because I'm getting older, so I don't want

11  to sleep with my brother.

12      Q    But for some period of time, you and your brother

13  shared your--

14      A    Yes, some period of time, yes, and then after some

15  period of time, he moved to the other, to the living room.

16      Q    Was it, would it be fair to say it was about two

17  years ago that--

18      A    Yeah, two years ago--

19      Q    --you and William shared a room?

20      A    Yeah, two years ago, probably, three.

21      Q    And then after, when the two of you shared that

22  room that you're in now--

23      A    Um-hum.

24      Q    Is that right?

25      A    Not now.  We ain't sharing a room now.

CABAN - 10/30/03                    14

1    Q    No, but about two years ago?

2    A    Like two years ago, something like that, three.

3    Q    And then William moved to the living room?

4    A    Yeah, to the living room.

5    Q    And then about a month ago, William moved to the

6    basement?

7    A    Then he went to the basement, yeah.

8    Q    Was there a particular closet in the house where

9    William kept his belongings?

10   A    He always had his same closet that was there that

11   he had, he got his keys and stuff like that in.  He does his

12   stuff, and he don't tell the family nothing what he does.

13   Q    Now, that closet, is that the hallway closet?

14   A    Yeah.

15   Q    The closet that's William's?

16   A    Yeah.

17   Q    And you indicated that closet, does that have a

18   key?

19   A    Yeah.

20   Q    And do you know who has that key?

21   A    My brother.

22   Q    William?

23   A    Yeah.

24   Q    And when William stayed in the living room, did he

25   use that closet as his, where his belon -- that's where he

CABAN - 10/30/03                    15

1  kept his belongings?

2      A    Yeah, that's where he kept his belongings.

3  Whatever he had there, that's his business.  You know what I

4  mean?  It's not my business.  That's his business, so, you

5  know, he never told me nothing, so.

6      Q    When William moved down to the basement, did he

7  still keep his belongings--

8      A    Yeah--

9      Q    --in the closet on the first floor?

10     A    Yeah, because he just moved off there, then he was

11 living in the living room, so he had a closet.  See, living

12 in the living room, he ain't going to put his clothes

13 nowhere in the living room.  It's going to be ugly.  So he

14 have to have a closet.

15     Q    Was there--

16     A    I mean -- yeah.

17     Q    I'm sorry, Mr. Caban.  Is there a closet in the

18 basement, in his room in the basement?

19     A    No.

20     Q    So did he hang things in that closet in the

21 hallway, in the first floor hallway; do you know, is it a

22 space for hanging things?

23     A    Yeah, hanging like little, little hang, yeah,

24 like, like clothes, put clothes inside the closet, yeah, not

25 outside.

1        Q    Now, and did you have a key to that closet?

2        A    No.

3        Q    Anybody else in your family, as far as you know,

4    have a key to that closet

5        A    No, not that I realize.  I don't think so.

6        Q    Just William?

7        A    Just, yeah, my brother.

8        Q    Now, did you, have you ever seen, you weren't

9    there when the police were conducting some of their

10    search--. A              No, no--

11        Q    You'd already gone to work; is that right?

12        A    They, they, I said I'm going to work at 7:00, I

13    have to be at 8:00, I'm running late, I don't want to run

14    late to work, so they let me go, put my clothes, I didn't

15    took a shower, nothing, and went to work all dirty.

16        Q    Now, does William have an Army jacket or a green

17    jacket or something that you know of; have you seen him

18    wearing--

19        A    He got so many clothes there, I don't even know,

20    keeping track, so I don't know what he have, not have, what

21    he got.  I keep track of my own stuff.

22        Q    Had you ever seen William with a gun?

23        A    I never did.

24        Q    Had you ever seen him with drugs?

25        A    No.

CABAN - 10/30/03                                    17

1    Q    Now, what size shoe do you wear, Mr. Caban?

2    A    Ten.

3    Q    Did William come upstairs to use the kitchen; was

4    there a kitchen downstairs in the basement?

5    A    No.

6    Q    So if he wanted--

7    A    Eat something, he go upstairs, yeah, of course, in

8    my mother's house.

9    Q    All right.  And, and when he wanted to get his

10   clothes, would you see him regularly coming upstairs to go

11   to that closet?

12   A    Because I, I work, yes, I work, and I'll see him

13   taking a shower.  Once in a while, he comes in the closet

14   and then he leaves.  Most of the time, I be stuck in a room

15   watching movies, so I don't know if he goes to the closet or

16   not.  Sometimes he goes to closet, sometimes I don't see him

17   because I work, and then go to my room, see a movie.

18   Q    But there were times when you've seen him taking

19   things out of that closet?

20   A    Yeah, like, like clothes.  That's it, you know,

21   clothes, pants.

22   Q    Now, Mr. Caban, after you left for work, did, did,

23   were you told, in fact, today, that there were a couple of

24   rounds of ammunition that were found somewhere in your--

25   A    Yeah, yeah, they had told me.

CABAN - 10/30/03                    18

1        Q    And they were in a container of some sort on top

2   of a dresser?

3        A    I guess it was in a container.  I just, I had so

4   much stuff there that I don't even keep track of my stuff

5   because I put stuff there, put stuff here, stuff there, and

6   it was there from years.

7        Q    Were those rounds, were those rounds of ammunition

8   yours?

9        A    No.

10       Q    Do you remember ever seeing them before?

11       A    No.

12            MS. HINKLE:  Do the grand jurors have any

13   questions for Mr. Caban?

14            GRAND JUROR:  Does your brother William have a

15   job?

16            THE WITNESS:  Yeah, he used to have a job, yeah.

17            GRAND JUROR:  Does he have one now?

18            THE WITNESS:  No.

19            GRAND JUROR:  How long ago did he have a job?

20            THE WITNESS:  I think a year ago.  He used to work

21   for Mario Manor, a nursing home.

22            GRAND JUROR:  Is that in Framingham?

23            THE WITNESS:  No, that's South Boston.

24            MS. HINKLE:  In South Boston?

25            THE WITNESS:  Yeah, in South Boston, yeah.

CABAN - 10/30/03                    19

1          GRAND JUROR:  And it's been about a year?

2          THE WITNESS:  Yeah, like a year.

3          GRAND JUROR:  Thank you.

4          MS. HINKLE:  Any additional questions?

5          GRAND JUROR:  Did you say you heard the knock, you

6   got up and you were going to the door to open it--

7          THE WITNESS:  Yeah--

8          GRAND JUROR:  --when they burst the door open?

9          THE WITNESS:  They bust the door open, yeah.

10         MS. HINKLE:  Additional questions for Mr. Caban?

11         GRAND JUROR:  Who's older, you or William?

12         THE WITNESS:  Me.

13         MS. HINKLE:  Do you know how old William is,

14  Mr. Caban?

15         THE WITNESS:  I think he turned 24, I think, I

16  think this month that passed.

17         MS. HINKLE:  And hold old are you, sir?

18         THE WITNESS:  I'm 29.

19         GRAND JUROR:  Do you think your brother deals

20  drugs?

21         THE WITNESS:  No, not that I know of.  He keep to

22  himself if he do it, you know.

23         MS. HINKLE:  Additional questions for Mr. Caban?

24  Yes?

25         GRAND JUROR:  Do you know, for the past year after

                    APEX Reporting
                    (617) 426-3077

1  your brother's been unemployed what his source of income is?

2           THE WITNESS:  Some of this stuff, I don't even

3  know.  I know that he had a job for one year.  That's the

4  thing I know.  After that, he probably went to find another

5  job or something because I, like I said, I work so I don't

6  know what he does in his free time, so.

7           MS. HINKLE:  And, Mr. Caban, I informed you

8  earlier that, that, of your rights and that there was no

9  interest in pursuing charges against you based on those

10 bullets that were found in your room; is that right?

11          THE WITNESS:  Yeah.

12          MS. HINKLE:  Okay.  Any additional questions for

13 Mr. Caban?

14          (No response.)

15          MS. HINKLE:  Okay.

16          GRAND JUROR:  Okay.  Thank you for coming in.

17          THE WITNESS:  All right.  Thank you.

18          (Whereupon, at 11:42 a.m., October 30, 2003, the

19 witness was excused.)

20

21

22

23

24

25

21

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before:    A FEDERAL GRAND JURY

in the Matter of:

UNITED STATES OF AMERICA

VS.

JOHN DOE

Place: Boston, Massachusetts

Date:  October 30, 2003

were held as herein appears, and that this is the original

transcript thereof.

OFFICIAL REPORTER (Signature)
Jody L. Perkins

EXHIBIT D

1

I
1 - 22

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    VS.                Case No.

JOHN DOE.

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Thursday
October 30, 2003

APPEARANCE:  MARIANNE HINKLE
               Assistant U.S. Attorney

WITNESS:     CLAUDIA CABAN

*APEX Reporting*
(617) 426-3077

2

# I N D E X

WITNESS                                                    PAGE

Claudia Caban

    Examination by Ms. Hinkle                        3

EXHIBITS   DESCRIPTION                                     PAGE

None

CABAN - 10/30/03

3

1                            P R O C E E D I N G S

2                                                            (11:45 a.m.)

3                              CLAUDIA CABAN, Sworn

4              EXAMINATION BY MS. HINKLE:

5         Q    Please, state your name and spell your last name

6    for the record?

7         A    Claudia Caban, C-A-B-A-N.

8         Q    And is your address 61 Ceylon Street, in

9    Dorchester?

10        A    Yes.

11        Q    And how old are you, Ms. Caban?

12        A    Twenty-seven.

13             MS. HINKLE: Now, Ms. Caban, first, I'd just like

14   to read some rights to you.  I explained these to you before

15   you came into the Grand Jury, but as I told you, you're

16   appearing before a Federal Grand Jury, and the Grand Jury's

17   conducting an investigation of alleged violations of federal

18   criminal law, including felon in possession of a firearm.

19             Under the Fifth Amendment of the United States

20   Constitution, you have a privilege to remain silent, the

21   right to remain silent and to refuse to answer any question

22   asked of you if a truthful answer might incriminate you.

23             As you can see, we have a court reporter, as I

24   told you, and a microphone right in front of you, so

25   everything you say is recorded, as well as the questions I

*APEX Reporting*
(617) 426-3077

CABAN - 10/30/03                          4

1   ask.  They're all recorded by this court reporter--

2              THE WITNESS:  Um-hum--

3              MS. HINKLE:  --and anything you say in this

4   proceeding could be used against you or against others in

5   any legal proceeding; do you understand all those things

6   that I've told you?

7              THE WITNESS:  Yes, I do.

8              MS. HINKLE:  Okay.

9              BY MS. HINKLE:

10      Q    Now, Ms. Caban, you indicated you live at

11   61 Ceylon Street?

12      A    Yes.

13      Q    And you live there with your mother, your brother

14   Carlos and your brother William?

15      A    Yes.

16      Q    And have you lived in that house for a number of

17   years now?

18      A    Yes.

19      Q    And, in fact, it's a three-family house, and for

20   some time, your family had all three floors; is that true?

21      A    No.

22      Q    Okay.  At some point, you had--

23      A    Well, are you talking about the first, second and

24   third?

25      Q    Yes.

CABAN - 10/30/03

5

1  A  Just the third, when my father rented the

2 apartment, and then when he bought the house, we moved to

3 the first floor.

4  Q  And you've been in the first floor ever since?

5  A  We've been in the first floor.

6  Q  And--

7  A  And William didn't have a room, so he went

8 downstairs to the basement.

9  Q  Now, at some point, did William stay in the living

10 room--

11  A  Yes--

12  Q  --in the house?  And before William stayed in the

13 living room, at some point, did he actually share a room

14 with Carlos?

15  A  In that first floor, no.

16  Q  On the first floor, no, not that you recall?

17  A  No.

18  Q  Did William stay in the, was William always in the

19 house or did he move away for a time and come back?

20  A  He was in jail one time.

21  Q  Was there any point --

22    MS. HINKLE:  I'm just going to instruct the grand

23 jurors not to consider that fact in any way in your

24 evidence, when you deliberate the evidence in this case.

25    BY MS. HINKLE:

*APEX Reporting*
(617) 426-3077

CABAN - 10/30/03

6

1    Q    Before William was in the living room, what was
2    his room, if you remember?

3    A    He didn't have a room.  It was the living room.

4    Q    Okay.  So you don't think he ever was in Carlos'
5    room?

6    A    No.

7    Q    So his bedroom was the living room?

8    A    Um-hum.

9    Q    Is that right?

10    A    Yes.

11    Q    I'm sorry.  You have to say yes or no--

12    A    Yes, yes.  I'm sorry.

13    Q    And was there, is there a closet in that living
14    room?

15    A    No.

16    Q    Did William use a particular closet for his
17    belongings when he was staying in the living room?

18    A    It's in the hallway.

19    Q    And is that in that main hallway?

20    A    It's the main hallway, yes.

21    Q    As you come in the front door, it's sort of right
22    there on the righthand side?

23    A    Yes.

24    Q    And does that closet have a lock to it?

25    A    Yes.

CABAN - 10/30/03

7

1    Q   And do you know if there's a key to that closet?

2    A   Yes.

3    Q   Do you know who has that key?

4    A   William.

5    Q   Do you have a key for that--

6    A   No.

7    Q   Do you know if anybody else in your family does?

8    A   No one else have a key.

9    Q   And William kept his belongings in that closet?

10    A   Yes.

11    Q   And that's even when he was staying in the living

12 room, he did?

13    A   Yes.

14    Q   Now, at some point, did William move from the

15 living room down into the basement?

16    A   Yes.

17    Q   Do you remember about when that happened?

18    A   Three months, the summer.

19    Q   Maybe sometime in the summer?

20    A   Uh-huh.

21    Q   Again, you have to say yes or no.

22    A   Yes.

23    Q   And is there a closet in that basement apartment

24 of William's?

25    A   No.

CABAN - 10/30/03

8

1    Q    So did William continue to keep his clothes and

2    other belongings in that same first floor hallway--

3    A    Yes.

4    Q    Now, the other bedrooms that are in your house, as

5    I understand it, after the living room, the first bedroom

6    would be Carlos'?

7    A    Yes.

8    Q    The second bedroom would be yours?

9    A    Yes.

10    Q    And the third would be your mother's?

11    A    Yes.

12    Q    Now, did William come up into the first floor

13    routinely, even after he moved down into the basement?

14    A    I'm not sure of it's all the time because I don't,

15    I'm not there.  I go to work, and then I'm, I go home late,

16    but I saw him a few times home.  He still, he still went up.

17    Q    He'd still come upstairs?

18    A    Um-hum.

19    Q    Would he use the kitchen upstairs?

20    A    (No verbal response.)

21    Q    There was no kitchen down in the basement; is

22    there?

23    A    There's no kitchen.

24    Q    So if he wanted something, to cook something or

25    something like that, he'd have to use the first floor

CABAN - 10/30/03                    9

1  apartment?

2      A    I never saw him cooking anything.

3      Q    Did you ever see him actually using that closet,

4  taking things out of it, putting clothes into it, anything

5  like that?

6      A    Yes.

7      Q    Did you ever see a green Army jacket or a green

8  coat of some kind of William's?

9      A    No.

10     Q    You don't remember that?

11     A    (No verbal response.)

12     Q    Now, does anybody else keep items in that same, in

13  that closet that's William's, as far as you know?

14     A    No, just that laundry thing that I told you before

15  that I thought it was my mom's.  It could be hers.

16     Q    You thought the basket, itself, might be hers?

17     A    Um.

18     Q    The items that were in there, the clothes that

19  were in there--

20     A    I don't know what was in the basket.

21     Q    Okay.  Did you see, at some point -- well, let me

22  ask this.  Were you home in the early morning hours of

23  yesterday--

24     A    Yes--

25     Q    --when the agents came to execute the search

CABAN - 10/30/03                                    10

1   warrant?

2        A    Yes.

3        Q    In fact, you were taking a shower when they

4   arrived; is that right?

5        A    Yes.

6        Q    And at some, at one point, the agents actually

7   opened the door?

8        A    Yes.

9        Q    And then did they close it again?

10       A    I closed it.

11       Q    Now, at some point, did the agents have you and

12   your mother and your brother all in the living room while

13   they were doing a search?

14       A    Yes.  Well, they were looking for my brother.

15   They were asking for my brother.

16       Q    Asking where William was?

17       A    "Where's William?  Where's William?  Where's

18   William?  Where's William?"  And I was just asking for the

19   warrant, and like I told you before, they didn't give me the

20   warrant right away.  They were just looking for my brother.

21   And then when I saw the warrant, it didn't have my brother's

22   name.  They just had a search warrant, but they were looking

23   for William.  William was not in the house.

24       Q    He wasn't, he wasn't in your apartment?

25       A    No.

CABAN - 10/30/03                                11

1       Q    Did you know where William was yourself?

2       A    No.

3       Q    Are there two ways to get to the basement space

4    where William was staying?

5       A    Through the back and the front.

6       Q    So you can actually go from your apartment into

7    the basement?

8       A    Uh-huh.

9       Q    Is that right?  You have to say yes or no.

10      A    Oh, yes.  I keep forgetting.  I'm sorry.

11      Q    But there's also a way to go in and out of the

12   basement from an outside door?

13      A    Yes.

14      Q    So William could come in or be home or not be

15   home, and you might not know because he could be coming in

16   and out of that door?

17      A    Yes.

18      Q    And is that, do you remember or know at all how he

19   usually went into his space, through the outside door or

20   through your apartment door?

21      A    Through the front.  Well, he used both.

22      Q    He used both?

23      A    (No verbal response.)

24      Q    I'm sorry.  You have to say yes or no.

25      A    Yes.

CABAN - 10/30/03                                    12

1          Q     Okay.  Did the agents tell you that they found

2     some items in that closet--

3          A     Yes--

4          Q     --when they searched; did they tell you they found

5     some guns there?

6          A     Yes.

7          Q     And drugs?

8          A     Yes.

9          Q     Had you ever seen any of those items n the closet?

10         A     No.  I don't go into that closet.

11         Q     Had you ever seen William with any guns?

12         A     No.

13         Q     Had you ever seen him with any drugs?

14         A     No.

15               GRAND JUROR:  May I ask a question?

16               MS. HINKLE:  Yes, ma'am, certainly.

17               GRAND JUROR:  When was the last time you saw

18     William?

19               THE WITNESS:  Yesterday.

20               GRAND JUROR:  You did.  Morning?  Afternoon?

21               THE WITNESS:  The same, in the morning.

22               GRAND JUROR:  In the morning?

23               THE WITNESS:  In the morning.

24               GRAND JUROR:  So the day before this all happened,

25     you saw him; correct?

*APEX Reporting*
(617) 426-3077

CABAN - 10/30/03                                          13

1            THE WITNESS:  The day before.

2            GRAND JUROR:  Yesterday was--

3            GRAND JUROR:  Yesterday when this all happened at

4    6:15 in the morning, you saw him prior to 6:15?

5            THE WITNESS:  No.

6            GRAND JUROR:  So when did you last see him before

7    this happened?

8            THE WITNESS:  No.  I think it was the day before.

9            GRAND JUROR:  You hadn't seen him in 24 hours?

10            THE WITNESS:  No.

11            GRAND JUROR:  Did you see him in the morning or

12    the afternoon when you did see him?

13            THE WITNESS:  Who?  William?

14            GRAND JUROR:  Yes.

15            THE WITNESS:  In the afternoon.

16            MS. HINKLE:  That would have been the afternoon,

17    if today is Thursday--

18            GRAND JUROR:  This happened Wednesday--

19            MS. HINKLE:  --and this search warrant was

20    executed yesterday morning, which would have been Wednesday

21    at approximately 6:15 -- now I'm confused--

22            GRAND JUROR:  At 6:15 a.m.--

23            MS. HINKLE:  --6:15 a.m. yesterday--

24            GRAND JUROR:  So it would have been Tuesday

25    afternoon.  Do you usually see him on a daily basis?

CABAN - 10/30/03                          14

1          THE WITNESS:  No.

2          GRAND JUROR:  You don't.  Thank you.

3          THE WITNESS:  Okay.

4          BY MS. HINKLE:

5     Q    How frequently would you say you would see William

6  in any particular week?

7     A    Once, twice.

8     Q    Different times?  Usually in the morning, usually

9  late at night; was there any pattern to when you'd see him?

10    A    When I'd get home late at night.

11    Q    And what time do you usually get home?

12    A    Seven, 8:00.

13    Q    So it would be after that?

14    A    Um-hum.

15    Q    You have to say yes or--

16    A    Yes.

17    Q    And as far as you know, were the clothes that

18  William wore most of the time in that closet that's in the

19  first floor with the lock?

20    A    Yes.

21         GRAND JUROR:  Do you know of any reason why

22  William would need guns or have guns; does he collect them

23  or--

24         THE WITNESS:  I have no idea.

25         GRAND JUROR:  No idea?

APEX Reporting
(617) 426-3077

CABAN - 10/30/03                                    15

1        THE WITNESS: No. I didn't even know he had guns.

2        MS. HINKLE: Ma'am?

3        GRAND JUROR: Are you, is your family close, you

4   know, if you all live in the same house, I just know when I

5   lived with my family, we saw everybody, you know, all the

6   time. Would you say that you're not close with this

7   brother?

8        THE WITNESS: I'm not that close with none of

9   them.

10       MS. HINKLE: Additional questions of this witness

11  if you--

12       GRAND JUROR: Did William put the lock on that

13  closet door or was the lock there and he just--

14       THE WITNESS: No. It was there, and he took the

15  key.

16       GRAND JUROR: Okay.

17       BY MS. HINKLE:

18  Q    Who used to keep their belongings in that closet--

19  A    My father--

20  Q    --before William?

21  A    My father.

22  Q    That was your father's closet?

23  A    He created that closet.

24  Q    Did he actually build it?

25  A    Um-hum. Well, not him. Somebody else.

CABAN - 10/30/03

16

1     Q    And, and it had a lock then?

2     A    Um-hum.

3     Q    I'm sorry.  You have to say yes or no?

4     A    Yes.

5     Q    And your father kept his belongings in there?

6     A    Yes.

7     Q    And at some point, did your father separate from

8 your mother and leave--

9     A    Yes--

10    Q    --the house?  About when was that?

11    A    Five years.

12    Q    About five years ago?

13    A    Yes.

14    Q    And at that point, did William then start using

15 that closet as his own?

16    A    Not five years ago because he was -- I told you.

17    Q    Okay.  So he wasn't in the home for some time?

18    A    Um-hum.

19    Q    But when, when William returned to 61 Ceylon

20 Street, did he then start using that closet--

21    A    Um-hum--

22    Q    --as his?

23    A    Yes.

24    Q    And then has that continually been his space ever

25 since he started using it up until now?

APEX Reporting
(617) 426-3077

CABAN - 10/30/03                    17

1           A    Yes.

2               GRAND JUROR:  How do you feel you were treated

3    yesterday morning?

4               THE WITNESS:  Humiliated.  I felt very bad.

5               GRAND JUROR:  You said that they pushed the door

6    open when you were taking a shower.  They didn't close the

7    door.  You closed the door?

8               THE WITNESS:  Yes.  I just pushed it like that.  I

9    said, wait, wait, and then I put my, my shirt on.

10              MS. HINKLE:  Additional questions for this

11   witness?

12              GRAND JUROR:  Yes.  Did I, I understand William

13   didn't cook, but did he, you know, eat food from your

14   refrigerator and use the kitchen?

15              THE WITNESS:  He didn't eat at home.

16              GRAND JUROR:  Did he use the bathroom?

17              THE WITNESS:  Huh?

18              GRAND JUROR:  Is there just one bathroom in the

19   apartment?

20              THE WITNESS:  He had a bathroom downstairs.

21              GRAND JUROR:  And for him to come upstairs from

22   the basement up into the apartment, would that be a locked

23   door; would he have to go through a locked door or would

24   that be, would that door be open?

25              THE WITNESS:  What, our door?

*APEX Reporting*
(617) 426-3077

CABAN - 10/30/03                                    18

1          GRAND JUROR:  Yes.  To get from the basement, for

2    him to come into the--

3              THE WITNESS:  No.  The door, he has a key.

4              GRAND JUROR:  He had a key.

5              THE WITNESS:  We all have a key.

6              MS. HINKLE:  The door between the basement and

7    your first floor apartment, that's a locked door, also?

8              THE WITNESS:  No.  It's open.  Just the door--

9              GRAND JUROR:  I'm sorry.  That's the door, that's

10   what I meant.  When he would come upstairs from the basement

11   into the apartment, would he have to go through a locked

12   door?

13             THE WITNESS:  No.

14             GRAND JUROR:  No.  He could just come on in?

15             THE WITNESS:  Yes.

16             GRAND JUROR:  Okay.

17             THE WITNESS:  Well, no.  He has to open the door.

18   There's the front door and the back door.

19             GRAND JUROR:  Yes.

20             THE WITNESS:  And then the basement's downstairs.

21   It's open.  You go up, and then you have to open to get into

22   our apartment, you have to open the door.

23             GRAND JUROR:  Is there a back stair, is there a

24   back stairway as well?

25             THE WITNESS:  Yes.


                          *APEX Reporting*
                          (617) 426-3077

CABAN - 10/30/03                               19

1            GRAND JUROR:  Okay.  So this is the door to the

2    back stairway.  It's a triple decker with front stairway and

3    back stairway; correct?

4            THE WITNESS:  Uh-huh.

5            GRAND JUROR:  Okay.  So he'd come up from the

6    basement, and he would use, he had a key to come into the

7    apartment?

8            THE WITNESS:  Yes.

9            GRAND JUROR:  Okay.  Did Tony have a key as well?

10           THE WITNESS:  Tony, no.

11           GRAND JUROR:  No.

12           MS. HINKLE:  Ma'am?

13           GRAND JUROR:  To the best of your knowledge, what

14   does your brother do for employment or income?

15           THE WITNESS:  He's not working.

16           GRAND JUROR:  Do you have any knowledge as to what

17   he's doing for income?

18           THE WITNESS:  No.

19           GRAND JUROR:  No.  You never had a discussion with

20   him about how he's--

21           THE WITNESS:  No--

22           GRAND JUROR:  --paying for--

23           GRAND JUROR:  I know you say you don't see him

24   that often, but when you did, did he ever have friends over?

25           THE WITNESS:  He had some friends over.

CABAN - 10/30/03

20

1          GRAND JUROR:  To the living room or to the
2    basement?
3              THE WITNESS:  In the basement.
4          GRAND JUROR:  And to the best of your knowledge
5    and your impression, what did you think he was keeping in
6    the closet?
7              THE WITNESS:  His clothes.
8          GRAND JUROR:  So did you find it suspicious at all
9    that he felt he needed to lock his clothes up?
10             THE WITNESS:  No.
11         MS. HINKLE:  Additional questions for this
12   witness?
13         GRAND JUROR:  Does everybody have locks on their
14   closets in the house?
15             THE WITNESS:  No, there's no locks on the closets.
16   Just that closet.
17         GRAND JUROR:  And he's the only one who has a key
18   to that closet?
19             THE WITNESS:  Yes.
20         MS. HINKLE:  Any additional questions for this
21   witness?
22             (No response.)
23         MS. HINKLE:  Okay.  Thank you.
24         GRAND JUROR:  Thank you.  Thank you very much.
25             THE WITNESS:  Okay.

CABAN - 10/30/03                    21

1          GRAND JUROR:  And I think I can say for the Grand

2    Jury that we all regret that it was rather upsetting and

3    embarrassing for you yesterday.

4          (Whereupon, at 11:59 a.m., October 30, 2003, the

5    witness was excused.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before: ___A FEDERAL GRAND JURY___

in the Matter of:


UNITED STATES OF AMERICA

VS.

JOHN DOE


Place: Boston, Massachusetts

Date:   October 30, 2003

were held as herein appears, and that this is the original

transcript thereof.


OFFICIAL REPORTER (Signature)
Jody L. Perkins

EXHIBIT E

## AFFIDAVIT OF TONY BRUNO

I, Tony Bruno, state that the following is accurate to the best of my knowledge and belief:

1.  I live in the basement unit at 61 Ceylon Street, in Dorchester.

2.  I was in the basement unit on the morning of October 29, 2003.

3.  Several law enforcement officers came into the basement.

4.  The officers did not ask me if they could come in. I did not invite them in. I did nothing to indicate I consented to their entry.

Signed under the pains and penalties of perjury.

_____            _____
Date                           Tony Bruno

EXHIBIT F



U.S. Department of Justice

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

March 22, 2004

J. Martin Richey, Esquire
Federal Defender Office
408 Atlantic Ave., 3rd floor
Boston, MA 02210

Re: United States v. William Caban

Dear Attorney Richey:

I am writing to disclose evidence pursuant to LR 116.2
(B)(1)(b). I recognize that this information should have been
turned over earlier, but, as you and I have discussed, the birth
of my second child delayed things a bit.

As it relates to your client's cooperation in showing the
agents where the guns were located, the agents (including two
Boston detectives) told me the following during an interview at
my office:

When the agents encountered Caban in his basement bedroom,
they asked him to show them where the guns were located (Caban
had already been Mirandized at this point). ATf Agent Rich
Donahue recalls telling Caban something to the effect of: "We
know where the guns are. We don't want to tear your house
apart." According to Donahue, Caban replied by saying, "Go
ahead, tear it apart." ATF Agent Phil Ball recalls hearing this
statement and then stating over the radio: "Chris (Demlein), go
ahead and tear it up, he doesn't care." Donahue also recalls
that he was saying things to Caban such as: "Let's handle this
like adults. Why not be a man about this." Boston Detective
Marvin Wright recalls trying to encourage Caban's cooperation by
telling him that he could save his family a lot of heartache if
he just showed them where the guns were. Detective Wright also

Attorney Richey
March 22, 2004
Page 2

recalls leaning over (Caban was sitting) and stating words to the effect: "Look, this thing's bigger than you, we're hear for a reason." "These guys (the agents) didn't just pop up here." Boston Detective Eric Bullman recalls saying to Caban words to the effect: "This doesn't have to go federal." "Firearms in a house at the state side (in state court) isn't even a felony." You don't even have to get arrested, you could get summoned in on the state side."

After approximately five minutes of this type of conversation, Agent Donahue said to Caban, "William, this is getting ridiculous, let's do this." At that point, Caban said, "alright" and got up and got his keys, which were then used to open the closet in which the evidence was found.

The agents stated that they were not all talking at once. Instead, when one of their appeals would not work, another one would say something different in hopes of gaining his cooperation. During this short period of time, Caban was basically seated and appeared somewhat stoic. The agents also explained to me that Caban seemed alert and sober when he was talking to them.

Also, enclosed please find Boston Detective Eric Bullman's report pertaining to his discussion with William Caban. Also, please be advised that Detective Bullman took notes of his interview with Caban but destroyed the notes after incorporating them into the report.

If you have any questions, please call me at 617-748-3174.

Sincerely,

William H. Connolly

EXHIBIT G

BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## REPORT OF INVESTIGATION

Page 1 of 4

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 002 |
|---|---|

| TITLE OF INVESTIGATION:<br>CABAN, William | |
|---|---|

| CASE NUMBER:<br>762020-04-0003 | REPORT NUMBER:<br>2 |
|---|---|

TYPE OF REPORT: *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Richard W. Donahue | SUBMITTED BY *(Title and Office)*<br>Special Agent, Boston II Field Office | SUBMITTED BY *(Date)*<br>11/12/2003 |
|---|---|---|
| REVIEWED BY *(Name)*<br>Thomas E. D'Ambrosio | REVIEWED BY *(Title and Office)*<br>Group Supervisor, Boston II Field Office | REVIEWED BY *(Date)*<br>11-12-2003 |
| APPROVED BY *(Name)*<br>William J. Hoover | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Boston Field Division | APPROVED BY *(Date)*<br>11-12-2003 |

## DESCRIPTION OF ACTIVITY:

On 10/29/03, ATF Agents and Boston Police served a Federal search warrant at 61 Ceylon St. in Dorchester, MA.

## SYNOPSIS:

On 10/29/03, ATF Agents and Boston Police served a Federal search warrant at 61 Ceylon St. in Dorchester, MA. Four firearms, cocaine, and money were recovered. William CABAN was arrested and placed in state custody.

## NARRATIVE:

1. On 10/28/03, Magistrate Judge Dein signed a Federal search warrant for 61 Ceylon St. in Dorchester, MA. The warrant was for the first floor apartment.

2. On 10/29/03, ATF Agents Donahue, D'Ambrosio, Campbell, Crowley, Oppenheim, Turner, Oppedessano, Tortorella, Demlein, and Ball served a search warrant at 61 Ceylon St. in Dorchester, MA. The Agents were assisted by Boston Police Detectives Perkins, Wright and Detective Sergeant Bullman.

3. Upon arriving at the scene, Detectives Wright and Perkins secured the back of the house, while S/A D'Ambrosio and Det. Sergeant Bullman secured the front. An entry team, consisting of all remaining ATF Agents, entered the front of #61 Ceylon through the unlocked door at the front of the residence.   S/A Donahue knocked on the door to apartment #1 and announced the Agents' presence. He loudly informed the occupants inside that they were there to serve a search warrant, and ordered the door opened. S/A Donahue was unable to hear anybody moving inside the house and breached the door.

BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
THE TREASURY
## REPORT OF INVESTIGATION

Page 2 of 4

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 002 |
|---|---|
| **TITLE OF INVESTIGATION:**<br>CABAN, William | |
| **CASE NUMBER:**<br>762020-04-0003 | **REPORT NUMBER:**<br>2 |

4. Upon entering the house, S/A's encountered three individuals. They were Carlos Caban (8/7/74), Claudia Caban (2/24/76) and Carmen Sanchez (10/20/45).

5. Prior to beginning the search of apartment #1, ATF S/A Tortorella and his canine "Herb" conducted an initial sweep of the apartment in an attempt to detect the scent of firearms or ammunition.

6. During the canine search being conducted in apartment #1, S/A's Crowley, Campbell, Ball and Det. Wright exited the apartment and knocked on a basement door that is located on ground level at the front of the house. An individual opened the door and identified himself as Tony Bruno (9/4/63). S/A Crowley explained to Bruno what was happening upstairs and asked if the Agents could come inside. Bruno invited the Agents inside and told them they could feel free to look around. When asked if anybody else was living in the basement, Bruno pointed towards a door and said "the landlords kid sleeps in there". S/A Campbell knocked on the door and it was opened by a man who identified himself as William CABAN. S/A Campbell explained to CABAN that a search warrant was currently being conducted upstairs and advised him of his Miranda Rights. CABAN told the Agents that they could come in and look in his room, but that they wouldn't find anything there.

7. S/A Donahue entered the basement and told CABAN that he wanted to know where the guns were. CABAN told S/A Donahue that he didn't know anything about the guns. It was explained to CABAN that although a Federal warrant was being served, that didn't necessarily mean that he would be charged federally if guns were found. After thinking for several minutes, CABAN told S/A Donahue that he would show him where the guns were. CABAN retrieved a set of keys from the table next to his bed and led S/A Donahue upstairs to apartment #1. CABAN led S/A Donahue to a small closet located in the main hall, and handed him the key to open the locked closet. S/A Donahue opened the closet and asked CABAN where the guns could be found. CABAN then pointed to a green jacket that was hanging in the closet and said "it's in there". At that point S/A Turner placed CABAN in handcuffs and sat him down in the kitchen. S/A Donahue looked in the green jacked and immediately pulled out a clear plastic bag filled with a white substance resembling cocaine. Found in the same pocket in the jacket was a fully loaded black .22 caliber semi-automatic pistol (serial # 424108). Additionally, S/A Donahue found an assortment of loose ammunition and $775. in cash in the same pocket as the gun and drugs. S/A Donahue then entered the kitchen and asked CABAN if there were any other guns in the closet. CABAN told S/A Donahue that there were not any other guns.

8. S/A Donahue continued searching through the closet. Inside a clothesbasket that was filled with folded men's clothes, S/A Donahue found a green canvas pouch. Located inside the pouch were three additional handguns. They are described as: one loaded Titan .25 caliber semi-automatic pistol, serial # D922233; one loaded Smith & Wesson model 36-6 .38 caliber revolver, serial # BEA8699; one loaded Bryco Arms model Jennings J-22 .22 caliber semi-automatic pistol, serial # 725497.

9. S/A Donahue then found a shoebox containing one pair of men's brown dress shoes, size 7, inside of the closet. Inside of one of the shoes was a black sock, which contained $3,700 dollars in cash. After finding

THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## REPORT OF INVESTIGATION

Page 3 of 4

| ADDRESSED TO: Special Agent in Charge ˉ ston Field Division | MONITORED INVESTIGATION INFORMATION: Boston Field Division FY-04 Report 002 |
|---|---|

| TITLE OF INVESTIGATION: CABAN, William | |
|---|---|

| CASE NUMBER: 762020-04-0003 | REPORT NUMBER: 2 |
|---|---|

the money inside of the shoes, S/A Donahue approached CABAN and asked for his consent to search his bedroom in the basement. CABAN gave S/A Donahue verbal and written consent. S/A Donahue then went down to the basement and saw that there were between 7 and 10 pairs of shoes lined up in a row in CABAN'S bedroom. S/A Donahue noted that all of the shoes were between sizes 7 and 8. S/A Donahue then asked S/A Campbell to verify which size shoe's Carlos Caban (William's brother and the only other male living in the apartment) wore. S/A Campbell ascertained that Carlos Caban wore a size 11 shoe, and verified that after seeing him put on a size 11 shoe that was in his bedroom.

10. Other items of note that were found during the search of the closet were: various legal papers with William CABAN'S name on them; a Charlestown High School identification card with the name William CABAN on it; $60. in cash (found in a jacket by Det. Wright); a white paper bag filled with assorted ammunition (found by S/A Oppedisano).

11. The bedroom identified as that belonging to Carlos Caban was searched. The only items of note found in that bedroom were two rounds of .22 caliber ammunition. These rounds were found on top of a dresser, inside of a small tin box along with a watch and a small amount of change.

12. The downstairs bedroom was searched after S/A Donahue received verbal and written consent from CABAN. The only items of note that were taken were $140.00 in cash and a black wallet with a Massachusetts state identification card inside with CABAN'S name and picture (both found by Det. Wright on nightstand).

13. After the search was completed, S/A's Donahue, D'Ambrosio and Det. Sgt. Bullman talked with CABAN about the guns and drugs that were found. When asked how he obtained the guns, CABAN said that he had purchased all 4 of them earlier in the summer of 2003 from several different men. He was unable to describe these men, or identify them by name. Det. Sgt. Bullman also asked CABAN where he got the cocaine. CABAN said that he had a connection in Boston that got him his drugs. CABAN told the officers that he didn't know the man's name, and that he didn't have a phone number where he could be reached. CABAN said that his drug connection pages him when he has drugs to sell.

14. Shortly after the search was completed, all Agents and officers left the scene. CABAN was taken into custody by the Boston Police Department and processed at the B-2 station. The substance that was believed to be cocaine was seized by the Boston Police Department. All other evidence collected at the scene is currently in ATF possession. Ballistics and fingerprint testing on the firearms are pending. Testing of the suspected narcotics is also pending. Federal prosecution is currently being discussed.

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## REPORT OF INVESTIGATION

Page 4 of 4

| ADDRESSED TO:<br>Special Agent in Charge<br>Boston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Boston Field Division<br>FY-04<br>Report 002 |
|---|---|
| TITLE OF INVESTIGATION:<br>CABAN, William | |
| CASE NUMBER:<br>762020-04-0003 | REPORT NUMBER:<br>2 |

ATTACHMENTS:

1. ATF Evidence Control Log 10/29/03
2. U.S. District Court Search Warrant # 03-m-1156-jgd
3. ATF Form 3400.16 Property Form
4. Search Warrant Affidavit
5. ATF Form 3220.11 Consent To Search