### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 03-10357-NG |
| | ) | |
| WILLIAM CABAN | ) | |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States, by and through United States Attorney Michael J. Sullivan and Assistant United States Attorney William H. Connolly, hereby submits this memorandum in opposition to Defendant William Caban's "Motion to Suppress Evidence" ("Mot. Supp.")

### FACTS[1]

On October 28, 2003, ATF Special Agent Richard Donahue ("Agent Donahue") submitted an application for a warrant to search Apartment #1 at 61 Ceylon Street in Dorchester, Massachusetts.  Attached to the warrant application and incorporated by reference therein was a probable cause affidavit by Special Agent Donahue ("Donahue Aff.").  The affidavit set forth, among other things, information provided to Special Agent Donahue from a confidential informant ("CI") regarding William Caban's ("Caban") possession of firearms. [Donahue Aff. at ¶ 6].

---

[1]     The recited facts were, for the most part, gleaned from police reports, grand jury testimony, and witness interviews pertaining to the incident.

1

The affidavit stated:

> According to the CI, within the past four weeks he/she
> was at 61 Ceylon Street, Dorchester, Massachusetts.
> The CI said that he/she was sitting on the front porch
> with CABAN and several other unidentified men.  The CI
> followed CABAN through the front door of the house and
> waited in the hallway while CABAN and another man
> entered Apartment #1 on the first floor.  The CI noted
> that CABAN and the other male entered the apartment
> empty-handed, and were not carrying any bags.  A short
> time later, the CI said that CABAN and the other male
> returned to the hallway from Apartment #1.  CABAN was
> carrying three handguns with him.  He passed two of the
> guns to two other men and kept one for himself.  The
> other male with CABAN exited Apartment #1 carrying a
> box which contained a large quantity of narcotics.  The
> CI said that he/she followed CABAN and the other men
> down to the basement.  Once in the basement, all three
> of the men with guns, including CABAN, placed the guns
> on a table that they were sitting at.  At that point,
> CABAN, with the help of several of the other men, began
> to package what the CI believed was crack cocaine into
> small bags.

The CI also told Agent Donahue that Caban resided at his
mother's residence at Apartment #1 at 61 Ceylon Street in
Dorchester, Massachusetts.  Agent Donahue corroborated this
information by reviewing ten separate Boston Police incident
reports dating back to 1978, each of which lists Caban's home
address as 61 Ceylon Street in Dorchester, Massachusetts.  Agent
Donahue also confirmed that the electric service at Apartment #1,
61 Ceylon Street, was listed to Carlos Caban, the father of
William Caban.

Both the application and the search warrant itself made
reference to an attached "Exhibit B," which detailed the property
on the premises that was the object of the search.  Magistrate

2

Judge Judith G. Dein issued the warrant that same date.  The
warrant authorized a search of the target premises for the
following:

> 1)    Guns, ammunition, gun cases, ammunition
>       magazines,holsters, spare gun parts, gun cleaning
>       equipment, photographs of firearms, receipts for the
>       purchase of said items.  These are the
>       instrumentalities and evidence of crimes involving
>       violations of Title 18, United States Code, Section
>       922(g)(1).
>
> 2)    Documents and other items indicating occupancy of the
>       premises, including personal mail, identification
>       documents, correspondence, financial documents, keys,
>       photographs, rental/lease agreements, and clothing or
>       other personal items.

On October 29, 2003, at approximately 6:15 a.m., ten ATF
agents and three detectives from the Boston Police Department
executed the federal search warrant at Apartment #1 at 61 Ceylon
Street.  Upon arriving at 61 Ceylon Street, an entry team entered
61 Ceylon Street through the unlocked front door.  Agent Donahue
knocked on the door to Apartment #1 and, in a loud voice,
announced the agents' presence and their purpose and requested
that the door be opened.  After approximately 10-12 seconds of
silence, Agent Donahue forced open the door.  Upon entry into the
apartment, the agents encountered Carlos Caban (brother of
target), Claudia Caban (sister), and Carmen Sanchez (mother).

Before beginning their search, Agents Crowley and Campbell
exited the apartment and knocked on the outside basement door,

3

which was located on the ground level at the front of the house. A man who identified himself as Tony Bruno, DOB: 9/4/63, answered the door. Agent Crowley explained what was going on upstairs and asked if he and Agent Campbell could enter the basement. Bruno invited the agents in and told them that he was renting a small room in the basement. When asked by Agent Crowley if anybody else was in the basement, Bruno pointed towards a door and said that the landlord's son lived in that room. Agent Campbell knocked on the door and it was greeted by a man who identified himself as William Caban. Agent Campbell explained to Caban that the agents were at the house to execute a search warrant. Agent Campbell read Caban his Miranda rights and Caban acknowledged understanding his rights. Caban immediately invited the agents into his room and stated, "You can look all you want down here, you're not going to find anything." The agents entered the room but did not begin to search at that point. The room was furnished and appeared to be Caban's bedroom.

A short time later, Agent Donahue entered the basement and began talking to Caban. Caban was also told that it would be in the best interest of his family to show the agents where the guns were, thus saving his mother and sister the embarrassment of having strangers search through their personal belongings. Caban at first said that he didn't know anything about the guns. Agent Donahue, Agent Ball and Boston Police Detectives Bullman

and Wright then explained to Caban that any cooperation he decided to give may be beneficial to him at a later date.  Agent Donahue told Caban, "We know where the guns are.  We don't want to tear your house apart."  Caban replied by saying, "Go ahead, tear it apart."  ATF Agent Phil Ball then stated over the radio: "Chris (Agent Chris Demlein), go ahead and tear it up, he doesn't care."  Agent Donahue also made statements to Caban such as: "Let's handle this like adults.  Why not be a man about this." Boston Police Detective Marvin Wright tried to encourage Caban's cooperation by telling him that he could save his family a lot of heartache if he just showed them where the guns were.  Detective Wright also stated words to the effect: "Look, this thing's bigger than you, we're hear for a reason. These guys (the agents) didn't just pop up here."  Boston Detective Eric Bullman stated to Caban words to the effect: "This doesn't have to go federal." "Firearms in a house at the state side isn't even a felony." You don't even have to get arrested, you could get summoned in on the state side."

Over the course of approximately five minutes of questioning, Caban appeared somewhat stoic, but was also alert and sober.  During their discussion with Caban, the two agents and two detectives were all standing near, but not surrounding, Caban.  There were no physical threats made and no intimidating tactics used.

After approximately five minutes of questioning, Agent Donahue said to Caban, "William, this is getting ridiculous, let's do this."  At that point, Caban said, "alright" and got up and retrieved a set of keys from the table next to his bed and led the agents upstairs to Apartment #1.

Caban led the agents to a small closet located inside the main hall of Apartment #1 and handed one of the agents the key to open the locked closet.  Agent Donahue opened the closet using the key and asked Caban where the guns could be found.  Caban pointed to a green jacket that was hanging in the closet and said, "It's in there."  At that point Caban was placed in handcuffs and escorted to the kitchen, where agents sat him down at the kitchen table.  In one of the jacket pockets agents found a clear plastic bag containing sixteen individually packaged bags of powder cocaine.  The total weight was approximately 20 grams. Found in the same pocket was a fully loaded .22 caliber semi-automatic pistol, as well as an assortment of loose ammunition and $775.00 in cash.  Inside a clothes basket in the same closet agents found a green canvas pouch containing three additional handguns: one loaded Titan .25 caliber, semi-automatic pistol; one loaded Smith & Wesson, .38 caliber revolver; and one loaded Bryco Arms, .22 caliber semi-automatic pistol.  Inside a size seven dress shoe, agents found $3,700 in cash.  Other items of note that were found during the search of the closet included:

6

various legal papers bearing William Caban's name; an old
Charlestown High School identification card with the name William
Caban on it; and a white paper bag filled with assorted
ammunition.  Agents also noted that the closet was filled
exclusively with men's clothing.

After finding the money inside of the shoe, Caban was asked
for consent to search his bedroom in the basement.  Caban gave
both oral and written consent.  In Caban's room the agents found
between seven and ten pairs of shoes lined up in a row.  All of
the shoes were between size seven and size eight.  The agents
then asked the brother, Carlos Caban, what shoe size he wore.
Carlos stated that he wore a size eleven shoe and confirmed the
same by putting on a size eleven shoe in the agents' presence.

The only other room in Apartment #1 that was searched was
the bedroom belonging to Carlos Caban.  The only items of note
that were recovered from Carlos Caban's bedroom were two rounds
of .22 caliber ammunition.  These were recovered in a small tin
dish that was located on top of a dresser.  The two rounds were
found mixed in with other miscellaneous items.

After completing the search of the apartment, SA Donahue
entered the kitchen and asked Caban about the guns.  Caban said
that he had purchased them over the summer of 2003 from four
different men.  He said he did not know their names and did not
know how he could get in touch with them.  When asked where he

got his cocaine from, Caban said that he had a connection in
Boston.  When asked how he contacted his connection, Caban said
that he did not have any way of contacting him.  He said that his
connection paged him when he had cocaine to sell.

<u>**DISCUSSION**</u>

I.   **THE CLERK MAGISTRATE CORRECTLY CONCLUDED THAT PROBABLE CAUSE
      EXISTED TO BELIEVE THAT EVIDENCE OF ILLEGAL FIREARMS
      POSSESSION WOULD BE FOUND AT 61 CEYLON STREET**

     **A.   LEGAL STANDARD**

     "A warrant application must demonstrate probable case to
believe that (1) a crime has been committed- the 'commission'
element, and (2) enumerated evidence of the offense will be found
at the place to be searched- the so-called 'nexus' element."
<u>United States v. Feliz</u>, 183 F.3d 82, 86 (1st Cir. 1999).  Under
this probable cause standard, "the 'totality of the
circumstances' disclosed in the supporting affidavits must
demonstrate 'a fair probability that contraband or evidence of a
crime will be found in a particular place.'" <u>United States v.
Zayas-Diaz</u>, 95 F.3d 105, 111 (1st Cir. 1996) (quoting <u>Illinois v.
Gates</u>, 462 U.S. 213, 238 (1983)).  This is a less stringent
standard than a preponderance or a "more likely than not"
standard.  As the First Circuit has stated, "the words
'reasonable cause' are perhaps closer to what is meant." <u>United
States v. Melvin</u>, 596 F.2d 492, 495 (1st Cir. 1979).  <u>See also</u>
<u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983) (the probable cause

standard does not demand a showing that the belief that evidence of a crime will be found be correct or more likely true than not).

When a search warrant application relates information provided by an informant, among the factors that are relevant to the probable cause determination are the following: whether the informant's veracity and basis of knowledge are demonstrated; whether the informant's information is self-authenticating by virtue of its specificity and detail; and whether some or all of that information has been corroborated. United States v. Zayas-Diaz, 95 F.3d at 111. "None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." Id.

Reviewing courts examining a magistrate's decision to issue a search warrant must consider the supporting affidavit "in a practical commonsense fashion." United States v. Feliz, 183 F.3d at 86. Moreover, because of the "strong preference for warrants under our Fourth Amendment," "considerable" deference must be accorded the magistrate's probable case determination, and in a "doubtful or marginal case" the reviewing court will normally defer to that determination. United States v. Zayas-Diaz, 95 F.3d at 111. See also United States v. Jewell, 60 F.3d 20, 22 (1st Cir. 1995) (courts grant "great deference" to the magistrate's evaluation of the supporting affidavit).

9

## B.    CI'S RELIABILITY AND BASIS OF KNOWLEDGE

As a preliminary matter, the government notes, and the defendant appears not to contest, that the CI's reliability and basis of knowledge were established.  The CI's reliability was established by his track record of providing truthful, accurate information.  SA Donahue's search warrant affidavit contained the following passage:

> The CI has provided accurate, truthful, and reliable information in the past and continues to do so to the present.  More specifically, the CI provided reliable information to Boston Police Deputy Superintendent Joseph Driscoll in his previous assignment with the Drug Control Unit on numerous occasions over the past several years.  On at least four occasions this information led to the seizure of controlled substances and/or the arrest and conviction of those in possession of the controlled substances.  Within the last few weeks, the CI demonstrated his/her reliability by making a controlled purchase of illegal drugs from an individual whom the CI had previously identified as an individual who was selling drugs.

[Donahue Aff. at ¶ 2].  The quoted passage, then, amounts to a sworn averment by Special Agent Donahue that on four occasions in the past the CI had provided accurate information to law enforcement officials that resulted in the seizure of evidence and the issuance of charges or the arrest of the target individual.   See United States v. Cochrane, 896 F.2d 625, 641 (1st Cir. 1990) (representation by police officer affiant that prior information provided by informant had resulted in seizure of a controlled substance and an arrest was sufficient to

establish the informant's reliability).  <u>See also</u> 2 Wayne R. LaFave, <u>Search and Seizure</u>, § 3.3(b) at 121 (3d ed. 1996) (a previous track record of reliability on the informant's part "elevates him to the level of presumably reliable sources of information, such as other police and ordinary citizens who happen to be witnesses to or victims of crime").  Nothing more was required to establish the CI's reliability.

The CI's basis of knowledge was established, quite simply, because his observations of Caban's firearms possession was first-hand.

### C.  PROBABLE CAUSE AND NEXUS

The defendant contends that the search warrant lacked the requisite probable cause because the supporting affidavit failed to establish the necessary nexus between the criminal activity and the place to be searched. [Mot. Supp. p. 8].  To the contrary.
Read as a whole, in a common-sense fashion, the affidavit plainly established a "fair probability" that evidence of Caban's firearms possession would be located at Apartment #1 at 61 Ceylon Street.

In contesting the nexus requirement, the defendant first asserts that the affidavit failed to establish the nexus to Apartment #1 because the CI did not see Caban actually retrieve the weapons from inside the apartment. [Mot. Supp. p. 8].  Thus,

the defendant asserts, the information in the affidavit fails to preclude other equally plausible scenarios for the source of the firearms.  As an example, the defendant contends that the individual who entered Apartment #1 with Caban could have been carrying the guns and then handed them over to Caban inside the apartment.  In support of this proposition, the defendant points out that the affidavit was silent as to the type of clothing worn by the men (the inference being that the man with Caban could have been wearing baggy clothing sufficient to conceal the possession of three firearms).  This contention, however, must be rejected because the magistrate was not required to engage in a piece-mail dissection of the affidavit.  Such a hyper-technical analysis is precisely the type of analysis which is discouraged by the First Circuit.  United States v. Ferreras, 192 F.3d 5, 10 (1st Cir. 1999) (search warrants and affidavits should be considered in a common sense manner, and hyper-technical readings should be avoided).  The logical and reasonable inference was that Caban and the other male, who were entered empty-handed and not carrying any bags when they entered Apartment #1, retrieved the three firearms and the box from inside Apartment #1.

In what the defendant characterizes as the more serious flaw with respect to the nexus element, he contends that the nexus has not been established because the affidavit fails to state what happened to the firearms after they were brought down to the

12

basement of 61 Ceylon Street. [Mot. Supp. p. 8].  While this is
true, the role of the magistrate in considering the nexus between
the illegal activity and the place to be searched is "to make a
practical, common-sense decision whether, given all the
circumstances set forth in the affidavit before him . . .there is
a fair probability that contraband or evidence of a crime will be
found in a particular place." <u>United States v. Feliz</u>, 182 F.3d
82, 86 (1st Cir. 1999)(quoting <u>Illinois v. Gates</u>, 462 U.S. at
238).

Employing this standard, there was ample information
contained in the affidavit demonstrating a fair probability that
the firearms were being stored inside 61 Ceylon Street.  As noted
above, the affidavit established that Caban had retrieved the
three firearms from his residence.  Although the ultimate
disposition of the firearms was not stated, the magistrate, in
considering where evidence of Caban's firearms possession would
be located in Apartmen #1, was permitted to draw inferences from
"the type of crime, the nature of the items sought, the extent of
an opportunity for concealment and normal inferences as to where
a criminal would hide [evidence of a crime]....'" <u>Feliz</u>, 182 F.3d
at 88 (quoting <u>United States v. Charest</u>, 602 F.2d 1015, 1017 (1st
Cir. 1979)).  Here, drawing inferences from the type of activity
and the nature of the items sought, the magistrate was warranted
in concluding that evidence of Caban's firearms possession would

13

be found inside Apartment #1 at 61 Ceylon Street.  The affidavit,
read in a common-sense fashion, established that Caban had
retrieved three firearms from the first-floor apartment at 61
Ceylon Street.  These firearms were then distributed among Caban
and two other men while they packaged cocaine in the basement.  A
magistrate could readily infer from this information that the
three men temporarily armed themselves for the purpose of
protecting themselves and their cocaine supply while they
packaged the drugs for distribution.  While the affidavit is
silent as to what the men did with the firearms when they were
done packaging the cocaine, the reasonable inference is that the
guns were returned to their original location inside the first-
floor apartment.  After all, not only did the firearms come from
the apartment, the evidence presented to the magistrate suggested
that Caban was the owner of the guns and that Caban lived in
Apartment #1 at 61 Ceylon Street.  In addition, the magistrate
could have reasonably inferred that the logical place to store an
expensive, durable item such as a gun is one's residence.  As
noted in the affidavit:

> . . . most people store their firearms in their homes and
> generally keep them for a period of time.  The reasons for
> this are that firearms are expensive, they do not wear out
> easily, they are not consumed by use like narcotics, and
> they are somewhat difficult to acquire.  This is especially
> true of persons who possess them unlawfully.

[Donahue Aff. ¶ 11].

14

Considering this information in light of the CI's observations, the magistrate could reasonably have concluded that Caban's retrieval of the firearms from his residence was an obvious indication that Caban, like most gun possessors, kept his firearms in his home.

Indeed, the requisite nexus has been established.  Read as a whole, in a common-sense fashion, the affidavit plainly established a "fair probability" that evidence of illegal firearms possession would be located inside Apartment #1 at 61 Ceylon Street.

### D.    GOOD-FAITH EXCEPTION

Even assuming, arguendo, that the affidavit somehow failed to establish probable cause to search Apartment #1 at 61 Ceylon Street, this Court nevertheless should uphold the search pursuant to the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984). Since no deterrent purpose is served by sanctioning "objectively reasonable" law enforcement conduct, the "extreme sanction" of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an "objectively reasonable" manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective.  Leon, 468 U.S. at 922, 926; Zayas-Diaz, 95 F.3d at 113; United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993).  The Leon Court stated: "We . . . conclude that suppression of evidence obtained

15

pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Leon, 468 U.S. at 918.  The Court identified four such instances where suppression is appropriate:  (1) the magistrate is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth";  (2) the magistrate "wholly abandon[s] his [detached and neutral] judicial role";  (3) the warrant is "so facially deficient [e.g., failing to list, with sufficient particularity, the evidence to be seized] ... that the executing officers cannot reasonably presume it to be valid";  or (4) the supporting affidavits are  "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Zayas-Diaz, 95 F.3d at 113, citing Leon, 468 U.S. at 923.

The defendant here asserts one of these grounds: that the lack of indicia of nexus was such that Agent Donahue could not have reasonably relied upon it.  This assertion is with merit.

As stated earlier, Donahue's affidavit, when read as a whole in a common-sense fashion, amply demonstrated the requisite nexus between the criminal activity and the apartment.  Even accepting the defendant's contention that the requisite nexus was not established, the agents belief in its existence was surely reasonable.

16

Thus, this sworn averment by an ATF agent provided the magistrate with an additional basis upon which to conclude the guns were returned to the first-floor apartment.

## II.   KNOCK AND ANNOUNCE

### A.   CABAN LACKS STANDING TO CHALLENGE THE AGENTS' COMPLIANCE WITH THE KNOCK AND ANNOUNCE REQUIREMENT

Law enforcement officers executing a warrant must knock on the entry door of a home and announce their presence and purpose before attempting forcible entry, except in certain limited circumstances which render announcement unreasonable. United States v. Sargent, 319 F.3d 4, 8 (1st. Cir.) cert. denied, 124 S.Ct. 920 (2003). In Wilson v. Arkansas, 514 U.S. 927 (1995), the Supreme Court held that the common law requirement that officers announce their identity and intention before entering a home to execute a search is part of the broader Fourth Amendment inquiry into the reasonableness of the officers' entry. Id. at 931; Sargent, 319 F.3d at 9. This knock-and-announce requirement serves three individual interests: (1) giving individuals the opportunity to comply with the law, thereby protecting the safety of the occupants and the police by reducing violence; (2) preventing the destruction of property occasioned by forcible entry; and (3) protecting the privacy of individuals by giving them the opportunity to "prepare themselves" for entry by law

17

enforcement officers by, for example, "pull[ing] on clothes or get[ting] out of bed." United States v. Espinoza, 256 F.3d 718, 723 (7th Cir. 2001), cert. denied, 534 U.S. 1105 (2002), quoting Richards v. Wisconsin, 520 U.S. 385, 393 n.5 (1997); accord United States v. Dunnock, 295 F.3d 431, 434 (4th Cir.), cert. denied, 537 U.S. 1037 (2002); United States v. Cantu, 230 F.3d 148, 151 (5th Cir. 2000); United States v. Granville, 222 F.3d 1214, 1218 (9th Cir. 2000); United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995) (identifying three interests as "safety," "property," and "privacy" interests).

The government does not dispute that Caban had an expectation of privacy in his apartment, and thus may claim that the actual search and seizure violated his Fourth Amendment rights. See Rakas v. Illinois, 439 U.S. 128, 140 (1978). But whether there was a Fourth Amendment violation depends in turn on "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Id.; cf. United States v. Garcia, 741 F.2d 363, 366 n.2 (11th Cir. 1984) (because knock-and-announce rule protects different interests than Fourth Amendment, rules of standing for two claims may diverge). Furthermore, "Fourth Amendment rights are personal rights which * * * may not be vicariously asserted." Rakas, 439 U.S. at 133-134, quoting Alderman v. United States, 394 U.S. 165, 174 (1968).

18

Thus, even assuming, *arguendo*, that the police officers violated the knock-and-announce rule, Caban has not demonstrated, and cannot demonstrate, that that violation infringed upon one of his personal rights.  Only a defendant whose personal interests have been infringed by the failure to knock and announce has standing to challenge that failure.  In <u>United States v. DeLutis</u>, 722 F.2d 902 (1st Cir. 1983), the defendant claimed that the officers who executed a search warrant for his house violated the knock-and-announce rule set forth in 18 U.S.C. §3109.  <u>Id.</u> at 908.  The Court, noting that the defendant was an "absentee owner" of the house who was in prison on an unrelated offense at the time the officers entered the house, stated that "[t]here is serious doubt under the circumstances whether [he] has standing to raise this issue on appeal."  <u>Id.</u>  Citing the safety and privacy interests served by the knock-and-announce rule, the Court reasoned that because the defendant was not in the home at the time of the search, he "hardly comes within the purposes of the [knock and announce] statute."  <u>Id.</u>  The Court did not have to reach the issue, however, because the defendant's convictions did not rest on evidence discovered in the house during the execution of the warrant.  <u>Id.</u>

Based on the same concerns, the Ninth Circuit has expressly held that a defendant who was not present during the warrant service and execution "lacks standing to challenge the officers'

19

compliance with the knock and announce requirement." Mena v.
City of Simi Valley, 226 F.3d 1031, 1035 n.2 (9th Cir. 2000); see
United States v. Valencia-Roldan, 893 F.2d 1080, 1081 n.1 (9th
Cir. 1990) (resident of apartment who was not present during
search has no standing to assert violation of 18 U.S.C. §3109).
Similarly, the Eighth Circuit has held that "the Fourth Amendment
does not require notice to an absent homeowner before execution
of a search for which a warrant has issued." United States v.
DeBuse, 289 F.3d 1072, 1075 (8th Cir. 2002); see United States v.
Stefonek, 179 F.3d 1030, 1034-1035 (7th Cir. 1999)(Fourth
Amendment does not require that searches be confined to times
when owner or occupant present to monitor search).

Caban was neither present living in the first-floor
apartment when the agent executed the search warrant there.
Rahter, Caban simply maintained control over a closet located
inside the apartment.  As a result, any failure to knock and
announce could not have impinged upon Caban's right to privacy or
his safety interest, because he was not present the time of the
execution, nor upon his property interest, because the officers
did not damage **his** property in any way in entering the first-
floor apartment.  Caban therefore does not have standing to
challenge any failure to knock and announce in the course of the
execution of the search warrant.

### B.   THE AGENTS KNOCKED AND ANNOUNCED BEFORE ENTERING APARTMENT #1 AT 61 CEYLON STREET

Caban contends that the police officers violated the knock and announce requirements when they entered they the apartment without without giving Caban's brother, Carlos, sufficient time to respond. [Mot. Supp. p. 9]

The police satisfied the knock-and-announce requirement by waiting sufficient time after knocking and announcing their presence and intention before entering the apartment.

To test the reasonableness of a warrant execution, courts examine the totality of the circumstances surrounding the execution of the warrant. See United States v. Banks, 124 S. Ct. 521, 525 (2003). Reasonable, the Supreme Court stated in Banks is "a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case". Id. The knock-and-announce requirement, "given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance." United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998). In evaluating the reasonableness of the timing of an entry, the focus is on how long a reasonable officer would wait before concluding that continued delay would be futile, would risk frustrating the purposes of the warrant, or would expose persons to serious danger. Cf. Richards, 520 U.S. at 394.

Here, the 10 to 12 seconds that the officers waited before entering the apartment was reasonable within the meaning of the Fourth Amendment, given the totality of the circumstances – the size of the apartment and the short amount of time it would have taken an occupant to reach and answer the door, and the fact that the warrant authorized a search for guns, which are inherently dangerous and posed an obvious risk to the agents.  Although the agents arguably did not have an exigency based upon the potential destruction of evidence, an exigency was created when the agents were confronted with 10-12 seconds of silence after loudly knocking and announcing their presence.  See e.g. United States v. Garcia, 983 F. 2d 1160, 1168 (1st Cir. 1993) (forced entry justified when police knocked, loudly announced their authority and purpose, and waited 10 seconds because contraband could be disposed of within seconds).  At the time of their entry to search for guns, the agents believed that Caban was living there and knew that he was a convicted felon.  Under those circumstances, the agents were justified in their concern that someone behind the apartment door could have been quietly retrieving and loading one of the guns that the agents were looking for.

## III. THE DEFENDANT'S ARREST AND STATEMENTS

### A.    ARREST

22

The defendant claims that he was unlawfully arrested and, therefore, any evidence seized subsequent to that arrest must be suppressed as fruits of the unlawful arrest. [Mot. Supp. p. 12] In response, the government asserts that the defendant was not arrested prior to the discovery of the challenged evidence.  This is simply a factual issue which will be resolved at the hearing on the motion to suppress.  In the event that the Court finds that an unlawful arrest occurred prior to the discovery of the challenged evidence, the government contends that the discovery of the evidence was inevitable. [See Inevitable Discovery discussion below].

### B.    THE STATEMENTS

The Due Process Clause of the Fifth Amendment protects against compelled confessions by means of a voluntariness test. <u>Dickerson v. United States</u>, 530 U.S. 428, 432-33 (2000). The voluntariness analysis is a totality of the circumstances test, taking into account both the characteristics of the accused and the details of the interrogation.  <u>United States v. Jackson</u>, 918 F.2d 236, 241 (1st Cir. 1990).  The ultimate issue is whether the will of the defendant was overborne so that the statement was not his free and voluntary act. <u>Id</u>; <u>United States v. Byram</u>, 145 F.3d 405, 407-408 (1st Cir. 1998)("the Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as

23

involuntary."). Among the factors courts commonly consider in assessing the totality of the circumstances surrounding testimonial evidence supplied by a defendant are: (1) the location of the questioning; (2) whether Miranda warnings were given; and (3) whether the accused initiated contact with law enforcement officials. An accused's personal characteristics, such as youth, drug problems, psychological problems, physical condition, and inexperience with the criminal justice system are also factors in this totality test. Georgetown Law Journal, 32nd Ed., 168-171 (2003). The government bears the burden of establishing the voluntariness of a confession by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972); Jackson, 918 F.2d at 241.

Here, the questioning took place in Caban's bedroom, he was read his Miranda warnings, he was sober and alert, and he was a 25 year-old adult with experience in the criminal justice system. All of these factors support a finding of voluntariness, notwithstanding the tactics employed by the agents to gain his cooperation. Indeed, the First Circuit has held that many of the tactic employed by the agents in this case are insufficiently coercive to constitute a Fifth Amendment violation: (1) promises of leniency or psychiatric treatment, United States v. Byram, 145 F.3d at 405 (confession voluntary despite officer's false assurance that defendant would not be prosecuted for his

statements); (2) an interrogator's appeal to the defendant's emotions, <u>United States v. Jackson</u>, 918 F.2d 236 (1st Cir. 1990) (confession voluntary even though defendant told that sister also under arrest, which encouraged defendant to take responsibility); and (3) an interrogator's false or misleading statements, <u>United States v. Palmer</u>, 203 F.3d 55 (1st Cir. 2000) (confession voluntary despite officer falsely telling defendant, who was molested as a child, that his coconspirator was a child molester).

Considering the totality of the circumstances, taking into account both the characteristics of Caban and the details of the interrogation, the evidence establishes that Caban's decision to talk to the agents after five minutes of questioning was the product of his own free will. Indeed, the brief duration of the questioning alone suggests that Caban's will was not overborne. Furthermore, it can readily be inferred from Caban's convictions and jail sentences[2] that he was keenly aware not only of his rights but of the consequences of confessing to the crime. Courts have relied on just such experience in determining that a confession was voluntary. <u>See e.g</u>. <u>United States v. Jackson</u>, 918 F.2d at 242 (1st Cir. 1990) (confession voluntary in part because of defendant's prior experience with judicial system). The

---

[2]    Caban's criminal record will be offered as evidence at the hearing on the motion to suppress.

agents' tactics, although intended to elicit a statement about the location of the guns, simply did not amount to coercion. Caban, who sat stoic and appeared to be unaffected by the agents statements, was free simply to refuse to direct the agents to the guns. The more likely reasons for Caban's cooperation were his interest in protecting his family from the embarrassment of a full-blown search and the inevitability of it. Caban, after all, knew that the agents had a search warrant. Under these circumstances, the evidence does not support a finding that Caban's will was somehow overborne. Instead, the evidence suggests that Caban gave thought to his options and decided that cooperating made the most sense given the inevitability of the discovery of the guns.

## IV.   INEVITABLE DISCOVERY

Under the inevitable discovery doctrine, a court may admit illegally obtained evidence if the evidence inevitably would have been discovered through independent, lawful means. In <u>Nix v. Williams</u>, 467 U.S. 431 (1984), the Supreme Court held admissible evidence concerning the location of a victim's body even though the police had obtained this information in violation of the defendant's sixth amendment right to counsel. At the time, law enforcement officers were conducting an extensive search around the area where the body was eventually located. The Court refused, on the basis of the inevitable discovery doctrine, to

exclude the body as "fruit from the poisonous tree."  467 U.S. at

447.  See also United States v. Lombard, 853 F. Supp. 543, 546

(D.Me. 1993) (doctrine of inevitable discovery applied to murder

victims' bodies when defendant revealed their location under

interrogation, because the search was already underway).

In United States v. Silvestri, 787 F.2d 736, 744 (1st Cir.

1986), cert. denied, 487 U.S. 123 (1988), the First Circuit

established the analytical framework for the inevitable discovery

rule:

> [T]here are three basic concerns which surface in an
> inevitable discovery analysis: are the legal means truly
> independent; are both the use of the legal means and the
> discovery by that means truly inevitable; and does the
> application of the inevitable discovery exception either
> provide an incentive for police misconduct or significantly
> weaken fourth amendment protection?

The government must prove inevitability by a preponderance of the

evidence.  Nix, 467 U.S. at 444.

In this case, the three requirements of the inevitable

discovery doctrine have been established.  First, there were

legal means of searching for the items at issue that were truly

independent of the agents' alleged misconduct in the questioning

(or arrest) of Caban.  The government had a search warrant for

the property before any misconduct occurred and the warrant was

lawfully obtained.  Second, the search of the apartment was truly

inevitable.  Although the questioning of Caban occurred prior to

the search, the intended purpose of the questioning was to merely

expedite the discovery of the evidence.  Thus, it cannot be
seriously disputed that the agents would have conducted their
search even if Caban had not chosen to cooperate.  Finally, the
discovery of the evidence was truly inevitable because it was
located in a place that would naturally have been searched for
evidence of firearms possession.  See United States v. Jones, 149
F.3d 715, 716-717 (7th Cir. 1998) (observing that "[i]t is hard
to understand how the discovery of evidence inside a house could
be anything but 'inevitable' once the police arrive with a
warrant").  An opposite result would be impossible to square with
Nix and with decisions of the First Circuit that have applied the
rule even where discovery of the evidence was far less
inevitable.  See, e.g., United States v. Procopio, 88 F.3d 21, 27
(1st Cir. 1996) (search of locked briefcase inevitable where
police knew defendant was subject of bank robbery investigation:
police would have contacted federal agent concerning briefcase
even had they not opened it and seen evidence, and federal agent
would have applied for warrant to search briefcase); Ford, 22
F.3d at 377-381 (applying inevitable discovery rule despite
warrantless search of house because, in absence of illegal
search, agents inevitably would have applied for and received
warrant based on untainted information establishing probable
cause); United States v. Zapata, 18 F.3d 971, 978-979 n.7 (1st
Cir. 1994) (applying inevitable discovery rule even assuming car

28

search illegal, because car unregistered and uninsured and therefore "surely would have been impounded" in future and police would have conducted lawful inventory search after impoundment and discovered evidence); <u>United States v. Silvestri</u>, 787 F.2d 736, 740-741 (1st Cir. 1986) (applying inevitable discovery rule where initial warrantless search of house revealed key evidence).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny Defendant's Motion to Suppress Evidence.

Respectfully submitted,

Michael J. Sullivan
United States Attorney


By:<u>/s/ William H. Connolly</u>
William H. Connolly
Assistant U.S. Attorney