UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
        v.                      )       CRIMINAL NO. 03-10357-NG
                                )
WILLIAM CABAN                   )

DEFENDANT'S POST-HEARING MEMORANDUM
IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE

Defendant submits this memorandum subsequent to the evidentiary hearing on his Motion to Suppress Evidence.[1]

In his original motion, defendant raised the following claims:

  1.    The warrant was not valid because it was not based upon probable cause.

  2.    The warrant was improperly executed because the agents failed to adequately knock and announce.

  3.    Defendant was unlawfully arrested in the basement because the agents had neither a warrant for the basement nor permission to be there.

  4.    Defendant's statements made subsequent to his arrest were involuntary.

With regard to the first claim (that the warrant lacked probable cause), defendant rests on the argument presented in his original motion.  Defendant hereby withdraws the third claim (that his arrest in the basement was unlawful).[2]  This memorandum addresses the remaining two claims:  the knock and announce was

---

[1]    An evidentiary hearing on the motion was begun on March 8, 2005, and continued on June 24, 2005.

[2]    Defendant further moves to withdraw Exhibit E to his original motion (the unsigned affidavit of Tony Bruno).

inadequate and defendant's statements must be suppressed because they were involuntary.

    I.   THE AGENTS FAILED TO ADEQUATELY KNOCK AND ANNOUNCE.

    A.   <u>The agents failed to adequately knock and announce</u>.

    1.   <u>The relevant testimony</u>.

The Court heard testimony from two agents regarding the October 29, 2003 search of 61 Ceylon Street.

Agent Richard Donahue testified that the entry team consisted of eight agents who assembled in the small common hallway outside the door to Apartment 1 at approximately 6:15 a.m. [3/8/05 Tr. at 7-9; 35].[3]  The agents were dressed in raid gear and carried raid equipment.[4]

Donahue testified that an agent knocked with "three loud knocks" [3/8/05 Tr. at 10]), and in a loud voice announced "Police, search warrant, come to the door."  [3/8/05 Tr. at 10]. The agents waited 2-2½ seconds, heard nothing, then repeated with a second round of three knocks and the same announcement. [3/8/05 Tr. at 10].  The agents waited another 2-2½ seconds, heard nothing, then repeated with a third round of three knocks

_____

[3]   This citation (3/8/05 Tr.  ) is to the transcript of the March 8, 2005 hearing.

[4]   Specifically, the agents were all wearing bullet-proof vests; they were all armed with handguns; at least four agents were carrying long arms (either a "shotgun rifle," an M-4 rifle, or an "air 15" rifle); at least two agents were wearing helmets; and one agent carried a riot shield.  [3/8/05 Tr. at 35-36].

and the same announcement. [3/8/05 Tr. at 11]. The agents waited "six, seven additional seconds after the third knock," [3/8/05 Tr. at 11], heard nothing, and rammed the door open. [3/8/05 Tr. at 12].

On cross-examination, Donahue was confronted with both his prior grand jury testimony (given on October 30, 2003, the day after the search), and with the report he wrote (dated November 12, 2003) concerning the search warrant execution. Neither in the course of his grand jury testimony, nor in his written report, did Donahue state that the knock and announce in this case comprised a three-part sequence. Rather, before the grand jury, Donahue testified as follows:

> We knocked and announced on Apartment 1, identified ourselves as police, we had a search warrant, open the door. We waited what we believed was a sufficient amount of time. We heard no one inside. No one came to the door. We then forcibly entered the door by taking the door down and, and made our entry into the apartment.

[3/8/05 Tr. at 37-38]. In his report, Donahue wrote:

> Special Agent Donahue knocked on the door to Apartment No. 1 and announced the agents' presence. He loudly informed the occupants inside that they were there to serve a search warrant and ordered the door opened. Special Agent Donahue was unable to hear anybody inside the house and breached the door.

[3/8/05 Tr. at 41].

Later in his grand jury testimony, Donahue was asked by a grand juror what he had meant when he testified that the agents

3

waited a "sufficient amount of time" before forcing their way in.
Donahue responded:

> We waited, Supreme Court hasn't decided what is a sufficient
> amount of time.  Five seconds has sometimes been mentioned.
> Yesterday we waited an unusually long, [ten] to twelve
> seconds . . .[5]

[3/8/05 Tr. at 38-39].

Agent Daniel Campbell also testified regarding the knock and
announce in this case.  [3/8/05 Tr. at 57-59].  Like Donahue,
Campbell testified to a three-part series of knocks.  He said
that each knock and announce took a couple of seconds and that
the agents waited 3-4 seconds between each knock and announce.
[3/8/05 Tr. at 58-59].  He further said that after the third
round of knocking, the agents waited "several seconds, maybe
more" before they rammed the door.  [3/8/05 Tr. at 60].

2.  <u>Proposed findings of fact</u>.

This Court should reject the testimony of Agents Donahue and
Campbell that the knock and announce in this case comprised a
three-part sequence.  Agent Donahue was in charge of the
investigation in this case.  [3/8/05 Tr. at 33].  In his grand
jury testimony -- given the day after the search warrant was

---

[5]    The transcript of the March 8, 2005 hearing reads "<u>six</u>
to twelve" seconds (not "<u>ten</u> to twelve").  This is probably a
transcription error.  The grand jury transcript, from which
counsel was reading during the cross-examination of Donahue,
reads "<u>ten</u> to twelve seconds."  <u>See</u> Exhibit B to defendant's
Motion to Suppress Evidence (the grand jury testimony of Agent
Donahue) at page 17, line 20.

executed -- Donahue made no mention of three distinct knocks and announcements.  Rather, he stated simply that the officers "knocked and announced."  Similarly, Donahue's report -- written two weeks after the search warrant execution -- makes no mention of a three-part sequence.  Rather, Donahue simply wrote that he "knocked on the door to Apartment No. 1 and announced the agents' presence."  These statements, made shortly after the search, undermine the agents' more recent testimony that the knock and announce actually involved a three-part series of knocks and announcements, and consequently spanned a longer period of time.

In addition to finding that the agents here simply knocked and announced once, the Court should further find that the agents waited, as Donahue testified before the grand jury, a maximum of 10-12 seconds before they rammed in the door.

3.  <u>Argument</u>.

Based on the proposed findings above, defendant maintains that the agents waited no longer than 10-12 seconds before they entered the apartment.  If the Court disagrees with these proposed findings, then defendant submits that the knock and announce in this case spanned no more than 16 seconds before the

agents rammed the door.[6]  In either event, the period of time was insufficient.

Whether the agents acted reasonably in this case is a fact-specific inquiry.  "There is no bright-line rule regarding the length of time the police must postpone a forced entry following their announcement; instead, each case is to be assessed on the totality of the circumstances."  United States v. Antrim, 389 F.3d 276, 279 (1st Cir. 2004).  At a minimum, the police should wait a reasonable period of time to allow a home's occupants to answer the door.  See United States v. Sargent, 319 F.3d 4, 9 (1st Cir. 2004).  The police may wait a shorter period of time only when they have a reasonable suspicion that they are in danger, or that evidence sought may be destroyed.  Id.  No such reasonable suspicion was present in this case.

a.  Danger to the officers.

Assuming arguendo that the agents had probable cause to believe that firearms were present in the apartment -- a point which defendant has not conceded -- that evidence, alone, is insufficient to create an exigency for the officers.[7]  See United

---

[6]    This calculation allows 2 seconds for each of the knocks [see 3/8/05 Tr. at 59], and credits Agent Donahue's testimony that the knocks came at 2-second intervals and that the agents waited 6 seconds before they rammed the door.

[7]    Defendant has argued that the warrant was not supported by probable cause because the affidavit lacks any information about where the firearms were taken after they were purportedly

States v. Bates, 84 F.3d 790, 795 (6th Cir. 1996).  More is
required.  Here, the record contains no evidence that defendant
had a propensity for violence (nor could it -- defendant has
never been charged with, much less convicted of, a crime of
violence).  Nor is there evidence that the agents knew defendant
would in fact be present when the warrant was executed; or that
defendant was awake and dressed[8]; or that defendant had heard the
agents coming; or that defendant was aware of the on-going
investigation, and would try to avoid arrest.  Cf. United States
v. Sargent, 319 F.3d at 10 (five second wait reasonable where
police had reason to believe that suspect had a large number of
knives dispersed throughout his small, two-room apartment, where,
among other factors, (1) officers knew suspect was in his
apartment because he had dealt drugs from there earlier in the
day; (2) the warrant was executed between 8:30 and 9:00 p.m., and
the suspect was awake and dressed; (3) suspect may have been
alerted by the officers' approach; and (4) the suspect had told

---

observed by the CI in the basement.

     [8]     The time of day a search warrant is executed can be a
critical factor in determining whether the warrant was served in
a reasonable manner.  See, e.g., United States v. Pinson, 321
F.3d 558, 567 (6th Cir. 2003).  Here, the warrant was served at
6:15 a.m., when many people are asleep or just awakening.  The
testimony in this case, for example, showed that defendant's
sister was taking her morning shower when the agents burst into
the home.  [3/8/05 Tr. at 61-62].

the CI that he was aware of recent drug arrests and wanted to get away).

In short, the record here is devoid of evidence amounting to an articulable, reasonable suspicion that the agents in this case faced the exigency of danger.

b.  Destruction of evidence.

Often, a shortened knock-and-announce time frame is permitted where the officers are searching for drugs or other contraband which could be easily disposed of.  See United States v. Banks, 124 S.Ct. 521, 526 & n.5 (2003)(15-20 second wait reasonable where "police could fairly suspect that cocaine would be gone if they were reticent any longer.").  The government has not claimed such an exigency here, and none exists.  Firearms cannot be flushed down the sink or toilet, and the apartment was effectively surrounded by law enforcement officers, preventing the occupants from successfully disposing of the firearms, for example, by tossing them out a window.

B.  Defendant has standing to raise the knock and announce challenge.

The government, treating Apartment 1 and the basement as distinct units, claims that defendant does not have standing to challenge the entry to Apartment 1 because he was in the basement at the time the warrant was executed.

8

The evidence, however, shows that Apartment 1 and the basement are not distinct units.  Agent Campbell, on June 24, 2005, testified that the units were connected by a back stairwell.[9]  In fact, the agents treated Apartment 1 and the basement as joined units, because they swept the basement stairway to "clear" it as they were initially executing the warrant.[10]

II.    DEFENDANT'S STATEMENTS MUST BE SUPPRESSED BECAUSE THEY WERE INVOLUNTARY.

A.    The statements in issue.

Defendant seeks to suppress two sets of statements, both verbal and non-verbal:

(1)    defendant's response to the officers' asking him where the guns were hidden (his retrieval of a key which fit the closet in which the evidence was found; his leading the officers upstairs to the closet; his attempt to open the closet; his pointing to the closet and/or a jacket and saying, "in there;" and his statement to Donahue, after Donahue found the first gun, that Donahue would find nothing else inside the closet) [see 3/8/05 Tr. at 25-27, 29]; and

(2)    defendant's statements made to Donahue and others at the kitchen table shortly after the closet was searched (regarding where defendant obtained the firearms and

---

[9]    Defendant has requested but not yet received a transcript of the June 24, 2005 hearing.

[10]    The government's standing argument, which involves an issue not squarely resolved in this Circuit, would significantly narrow Fourth Amendment protections.  If the Court reaches this argument, by finding for example that the basement was a distinct unit, defendant will submit further briefing upon request.

cocaine) [see 3/8/05 Tr. at 30-32; Exhibit G to
defendant's Motion to Suppress Evidence at ¶ 13].

B.    Argument.

The evidence regarding the manner in which defendant's
statements were initially elicited in the basement is largely
undisputed, at least with respect to the substance of the
statements or promises made to defendant by the officers.    In
sum, the officers first made emotional appeals to defendant to
spare his mother the heartache of a search of the entire
apartment.    [3/8/05 Tr. at 21; Exhibit F to defendant's Motion
to Suppress Evidence].    When that tactic failed, the officers
(specifically, Boston police detective Bullman) offered defendant
a deal:    if defendant cooperated and told the agents where the
guns were, he would be charged with a misdemeanor gun possession
charge in state court, and he would be summonsed to court on that
charge rather than arrested and hauled away in custody.[11]
[3/8/05 Tr. at 22, 50; id.].    Defendant has already briefed this
issue, assuming the foregoing facts, in his original motion
submitted prior to the evidentiary hearings.

In addition, the Court has now heard testimony regarding the
circumstances surrounding the interview in the basement.    Agent
Donahue testified that defendant was seated on a step in a narrow

_____

[11]    This was clearly deceitful.    Defendant was the target
of a federal investigation, and the search warrant was issued by
a federal magistrate.

hallway.  [3/8/05 Tr. at 47].  He was surrounded by four

officers, all of them armed and dressed in raid gear.[12]  [3/8/05

Tr. at 48-49].  One officer would lean over defendant and try one

tactic; when that tactic didn't work another officer would lean

over defendant and try another.  [3/8/05 Tr. at 24].  When these

circumstances are considered in conjunction with the substance of

the statements made by the officers, the totality suggests that

defendant's statements were coerced, not voluntary.[13]

Defendant's statements made at the kitchen table shortly

after the closet was searched must also be suppressed,

notwithstanding Agent Donahue's testimony that he read defendant

Miranda warnings immediately prior to eliciting those statements.

[see 3/8/05 Tr. at 31].  The interview came immediately upon the

heels of the first set of statements which led the officers to

the closet, and was held not more than twenty feet away.

Moreover, defendant still lingered under the promises made by

---

[12]    Donahue testified that the officers were not
"surrounding" defendant; that they were "not all over him, for
example."  [3/8/05 Tr. at 47].  Yet Donahue admitted that as
defendant sat in the narrow hallway, officers were positioned in
front of him, as well as behind him so that he couldn't escape.
[3/8/05 Tr. at 48].  Given the size of the hallway, and the
number and location of the officers, it begs credulity to say
that defendant was not, in fact, "surrounded."

[13]    Agent Campbell testified that he recited Miranda
warnings to defendant prior to defendant's interrogation in the
basement.  [3/8/05 Tr. at 67].  Because, as argued above,
defendant's statements were coerced, they were not the product of
a knowing, voluntary waiver of his Miranda rights.

Bullman.  The taint of the prior coercion was thus not dissipated when defendant was questioned at the kitchen table.  <u>See</u> <u>United States v. Merenghi</u>, 109 F.3d 28, 32 (1st Cir. 1997)(Where initial statement coerced, subsequent statement must be excluded unless "sufficiently removed from the milieu of the coerced statement so as to preclude any lingering taint.").

                                    WILLIAM CABAN
                                    By his attorney,

                                    /s/J. Martin Richey
                                    J. Martin Richey
                                      BBO# 559902
                                    Federal Defender Office
                                    408 Atlantic Ave., 3rd Floor
                                    Boston, MA  02210
                                    Tel: 617-223-8061

July 1, 2005