**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,      )
                               )
            v.                 )      CR. NO. 03-10357-NG
                               )
WILLIAM CABAN,                 )
      Defendant.               )

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE:**
**MOTION TO SUPPRESS**
**July 28, 2005**

**I.    INTRODUCTION**

Defendant William Caban ("Caban") moves this Court to suppress the fruits, including statements and physical evidence, of a search conducted pursuant to a warrant at 61 Ceylon Street, Apartment #1, Dorchester, Massachusetts, on October 29, 2003 [docket entry # 22].  Having reviewed the parties' memoranda and conducted a two-day hearing, I hereby **DENY** the motion to suppress.

**II. FACTS**

On October 28, 2003, ATF Special Agent Richard Donahue applied for and received a federal search warrant for 61 Ceylon Street, Apartment #1, in Dorchester.  The warrant application described 61 Ceylon Street as a three-story residence containing three apartments.[1]  The affidavit stated that Caban lived with

---

[1] Though the application did not note that the residence also has a basement unit, the accompanying affidavit did.

his family in Apartment #1 and that the address was listed as Caban's in ten Boston Police incident reports.

The affidavit included the following information from a confidential informant ("CI"):

> According to the CI, within the past four weeks he/she was at 61 Ceylon Street, Dorchester, Massachusetts.  The CI said that he/she was sitting on the front porch with CABAN and several other unidentified men. The CI followed CABAN through the front door of the house and waited in the hallway while CABAN and another man entered Apartment #1 on the first floor.  The CI noted that CABAN and the other male entered the apartment empty-handed, and were not carrying any bags.  A short time later, the CI said that CABAN and the other male returned to the hallway from Apartment #1.  CABAN was carrying three handguns with him.  He passed two of the guns to two other men and kept one for himself. The other male with CABAN exited Apartment #1 carrying a box which contained a large quantity of narcotics.  The CI said that he/she followed CABAN and the other men down to the basement.  Once in the basement, all three of the men with guns, including CABAN, placed the guns on a table that they were sitting at.  At that point, CABAN, with the help of several of the other men, began to package what the CI believed was crack cocaine into small bags.

The search warrant was granted by Magistrate Judge Dein and authorized the seizure of firearms and firearm-related items from Apartment #1, as well as documents related to occupancy of the apartment.  No warrant was issued for Caban's arrest.

The search warrant was executed by ten ATF agents and three Boston Police detectives on October 29, 2003.  According to the

testimony of Agent Donahue and ATF Special Agent Daniel Campbell, both of whom testified before me at the hearing on Caban's motion to suppress, the agents arrived at 61 Ceylon Street at 6:15 a.m. One of the agents knocked on the door three times and loudly announced, "Police, search warrant, come to the door." Hearing no response after two-to-three seconds, the agent knocked and announced their presence a second time. Again, the agents waited two-to-three seconds without hearing a response. After knocking and announcing a third time, the agents waited an additional six-to-seven seconds without hearing a response. Because a total of ten-to-twelve seconds had lapsed by this point, the agents forced the door open with a battering ram.[2]

Eight agents in riot gear with guns drawn entered the apartment. They ordered Carlos Caban to lie on the ground and handcuffed him. Agents saw Caban's mother, Carmen Sanchez, and then opened the bathroom door, where Caban's sister, Claudia Caban, was showering. The three family members were told to sit in the living room. They told the agents they did not know where Caban was.

At that point, several agents went to the basement to look for Caban. Agent Campbell testified that two agents walked out

---

[2] Caban's brother, Carlos Caban, testified before the grand jury that he heard a "hard knock" on the door and unlocked it. He further testified that before he could open the door, it flew open and nearly hit his head. Carlos Caban did not testify at the hearing before me. On this record, I accept the testimony of the agents.

of the apartment to the basement door located on the ground level at the front of the house.  Agent Campbell further testified that a man who identified himself as Tony Bruno answered the door when the agents knocked and that Bruno invited the agents into the basement.  Bruno stated that he was renting a room in the basement and that the landlord's son lived in another room in the basement.[3]

Agent Campbell then testified that the agents knocked on the door that Bruno identified as Caban's and a man who stated his name was William Caban opened the door.  Agent Campbell told Caban that the agents were there to execute a search warrant.  He read Caban his Miranda rights.  Caban said he understood those rights and invited the agents into his room.  The agents entered the room but did not begin searching it.

Agent Donahue joined the group in the basement and told Caban that his mother was very upset.  Agent Donahue encouraged him to "spare [his] mother the experience of going through this search."  When Caban did not respond, Boston Police Sergeant Detective Bulman suggested to Caban that cooperation could result in charges being brought in state court, where possession of firearms could be prosecuted as a misdemeanor, rather than in federal court, where it would be a felony.  Agent Donahue also

---

[3] Caban attached to his motion an affidavit from Bruno denying that he invited the officers into the basement.  During the hearing on the motion to suppress, however, Caban withdrew the Bruno affidavit.

encouraged Caban "to be a man" and show the agents where the guns were.

Having made no headway, Agent Donahue told Caban that the agents would tear the house apartment if Caban did not tell them where the guns were.  Caban told them to "go ahead and tear the house apart."  Agent Ball then radioed upstairs, "Go ahead and tear it up.  He doesn't care."  Before the agents upstairs began their search, however, Boston Police Detective Wright reiterated that Caban could save his family a lot of heartache if he just showed the agents where the guns were.  Detective Wright also stated, "Listen, we just didn't fall upon this.  We've been working this for a while.  We know [the guns are] here."  Then Agent Donahue again urged Caban to cooperate, saying, "Let's do this."  At that point, approximately five minutes after the exchange began, Caban agreed to cooperate by nodding and saying, "Okay."  Agent Donahue testified that Caban was alert and coherent during the entire exchange.

Caban picked up a set of keys in his bedroom and led the agents to a locked closet in the main hallway of Apartment #1. Caban handed the keys to Agent Donahue, who unlocked the closet and asked where the guns were.  Caban pointed to a green jacket. At that point Caban was placed under arrest, handcuffed, and Mirandized a second time.  He was then led to the kitchen.  Agent Donahue searched the closet and found approximately 20 grams of

powder cocaine, a loaded .22 pistol, loose ammunition, and more than $700.00.[4]  Agent Donahue went to the kitchen and asked Caban whether there were any other guns in the closet.  Caban replied that there were not.

Agent Donahue searched the closet, however, and found a pouch containing three loaded handguns.[5]  Inside a size 7 shoe -- the size worn by Caban[6] -- Agent Donahue found $3,700.00 in cash. In addition, Agent Donahue found legal papers bearing William Caban's name, an old Charlestown High School identification card bearing William Caban's name, and a white paper bag containing assorted ammunition.

Agent Donahue testified that after finding the money in the shoe, he asked for and received both oral and written consent from Caban to search his basement bedroom.  The only items of note found in Caban's bedroom were size seven and size eight shoes.[7]  The agents then searched Carlos Caban's room.  They found two rounds of .22 caliber ammunition in a small tin dish on top of his dresser.

---

[4] The government states that Agent Donahue found $775.00 in the jacket, while Caban claims that $750.00 was found.

[5] These handguns were a Titan .25 semi-automatic pistol, a Smith & Wesson .38 revolver, and a Bryco Arms .22 semi-automatic pistol.

[6] See note 7, infra.

[7] The agents determined that the defendant's brother, Carlos Caban, wore a size eleven shoe by asking him for his shoe size and by observing him to put on one of his size eleven shoes.

After they finished searching the apartment, Agent Donahue asked Caban where he got the guns.  Caban said that he purchased them during the summer of 2003, and that he traded cocaine for at least one of the guns.  He told the agents he did not know the name of the person from whom he purchased them.

III. **LEGAL ANALYSIS**

   A. **Was the Search Warrant Based Upon Probable Cause?**

A search warrant application must establish probable cause that "(1) a particular person has committed a crime (the 'commission' element), and (2) enumerated evidence of the offense will be found at the place to be searched (the 'nexus' element)." United States v. Beckett, 321 F.3d 26, 31 (1st Cir. 2003) (citing United States v. Zayas-Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996)).  "Under the 'probable cause' standard, the 'totality of the circumstances' disclosed in the supporting affidavit must demonstrate 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" Zayas-Diaz, 95 F.3d at 111 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)) (emphasis in original).

Courts reviewing a magistrate's decision to issue a search warrant must consider the supporting affidavit "in a practical, commonsense fashion." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).  In addition, reviewing courts "must accord considerable deference" to the magistrate's determination that

probable cause existed.  Zayas-Diaz, 95 F.3d at 111 (internal citations omitted).  Even in "a doubtful or marginal case," the reviewing court will "normally . . . defer to an issuing magistrate's 'probable cause' determination."  Id.

Caban argues that the information provided by the CI was insufficient to meet the nexus requirement.[8]  First, Caban notes that the CI did not actually see Caban and his companion retrieve the guns and cocaine after they entered Apartment #1.  Based on what the CI saw, Caban states that it is equally plausible that Caban's companion was carrying the guns on his person and handed the guns to Caban inside the apartment.  Second, Caban points out that the CI did not reveal what happened to the guns after Caban and the others packaged the cocaine in the basement.  Because the affidavit does not state that Caban returned the guns to Apartment #1, Caban asserts that there was not a "fair probability" that the guns would be found there.  In addition, Caban argues that the warrant applicant's failure to meet the nexus requirement is so obvious that the good faith exception established by United States v. Leon, 468 U.S. 897 (1984), does not apply.

---

[8] Though Caban does not challenge the CI's reliability and basis of knowledge, the government notes that Agent Donahue's affidavit states that the CI had provided law enforcement officials with accurate information in the past and was thus reliable.  The first-hand, detailed information provided by the CI, moreover, establishes an adequate basis of knowledge.

While Caban is correct in his characterization of the affidavit's omissions, they do not cause the warrant to fail the nexus requirement. As the government argues, a "practical, commonsense" reading of the CI's observations is that Caban retrieved the guns from Apartment #1 when he and his companion went inside to protect themselves while they packaged the cocaine. A further "practical, commonsense reading" of the situation is that Caban returned the guns to Apartment #1 once the packaging was complete. Based on the information contained in the affidavit -- particularly in light of the "considerable deference" afforded a magistrate's findings -- I believe that there was ample support for a finding of probable cause. The motion to suppress is therefore **DENIED** on this ground.

B.   <u>**Did the Agents Satisfy the "Knock and Announce" Requirement?**</u>

The common law requirement that law enforcement personnel knock and announce their presence before entering a home pursuant to a search warrant is part of the broader panoply of Fourth Amendment rights. <u>See</u> <u>Wilson v. Arkansas</u>, 514 U.S. 927, 931 (1995). "Police acting under a warrant usually are required to announce their presence and purpose, including by knocking, before attempting forcible entry, unless circumstances exist which render such an announcement unreasonable." <u>United States v. Sargent</u>, 319 F.3d 4, 8 (1st Cir. 2003), <u>cert. denied</u>, 124 S.Ct. 920 (2003). Determining whether law enforcement officials

have fulfilled their obligation to knock and announce is a fact-specific reasonableness inquiry that takes into account the totality of the circumstances. See United States v. Banks, 124 S. Ct. 521, 525 (2003). To justify shortening the reasonable waiting period that follows the "knock and announce" -- or to forego knocking and announcing altogether -- the officers must "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile or . . . would inhibit the effective investigation of the crime by, for example, allowing destruction of evidence." Id. (internal citation omitted).

Caban advances two arguments related to the "knock and announce" requirement. First, Caban urges the Court to reject the testimony of Agents Donahue and Campbell that the "knock and announce" procedure they employed comprised a three-part sequence. Caban argues that this testimony is fatally undermined by Agent Donahue's testimony before the grand jury on October 30, 2003, the day after the search. As outlined above, both agents testified at the hearing before me that their team knocked and announced their presence three times over the course of ten-to-twelve seconds before entering the apartment. Before the grand jury, however, Agent Donahue made no mention of knocking and announcing three times. Rather, he testified simply that the team knocked and announced and "waited what we believed was a

sufficient amount of time" before forcibly entering the
apartment. Similarly, Agent Donahue's report dated November 12,
2003, made no mention of a three-part "knock and announce"
sequence.

Though Caban is correct to note Agent Donahue's omissions, I
believe that his argument proves too much. Agent Donahue's prior
testimony and report do not contradict the testimony that Agents
Donahue and Campbell gave at the hearing on the motion to
suppress; they simply represent a less detailed recitation of the
"knock and announce" procedure followed. Accordingly, I decline
Caban's invitation to reject the agents' testimony that the
"knock and announce" procedure comprised a three-part sequence.

Second, Caban argues that a ten to twelve second wait was
unreasonable. In support of this argument, Caban notes that the
agents cannot credibly claim they were concerned about the
destruction of evidence. Unlike drugs, guns cannot be flushed
down the toilet. Moreover, agents were stationed outside in case
someone attempted to throw the guns out the window. He also
asserts that the futility exception is inapplicable because there
is nothing to suggest that the apartment's occupants refused to
answer the door. See United States v. Lucht, 18 F.3d 541, 549
(8th Cir. 1994) (observing that an unreasonably prolonged silence
connotes occupant's refusal to admit police). Finally, Caban
contends that the exigency of danger cannot justify the ten to

twelve second wait.  While Caban concedes that the agents were seeking guns and ammunition, he argues that Richards v. Wisconsin, 520 U.S. 385 (1997), stands for the proposition that categorical exceptions to the "knock and announce" rule are impermissible.  Id. at 1421 ("If a per se exception were allowed for each category of criminal investigation that included a considerable -- albeit hypothetical -- risk of danger to officers or destruction of evidence, the "knock and announce" element of the Fourth Amendment's reasonableness requirement would be meaningless.").

The reasonableness of the ten to twelve second wait is a close call, given that the agents executed the search warrant at 6:15 a.m. and that Apartment #1 was occupied by Caban's siblings and 58-year-old mother.[9]  Based on the CI's observations, however, the agents reasonably believed that Caban, a convicted felon, kept numerous handguns in the apartment and that they were easily accessible.  See, e.g., Sargent, 319 F.3d at 10 (finding a five second wait reasonable based on the exigency of danger when officers had reason to believe that defendant was dealing drugs from his home and kept a large cache of weapons there).  Cf. United States v. Garcia, 983 F.2d 1160, 1168 (1st Cir. 1993)

---

[9] But see United States v. Antrim, 389 F.3d 276, 281 (1st Cir. 2004) (asserting that "even an occupant not complicit in the drug crime may have some other strong motive to destroy evidence, such as a sense of familial loyalty").

(forced entry justified when police knocked, loudly announced
their authority and purpose, and waited ten seconds because
contraband could be disposed of within seconds); <u>Antrim</u>, 389 F.3d
at 280 (1st Cir. 2004) (stating that "frequently the courts have
approved brief delays in the 15-to-20-second range or less in
fairly typical drug cases"); <u>id.</u> at 281 (citing <u>United States v.
Holmes</u>, 175 F. Supp. 2d 62, 76 (D. Me. 2001), for the proposition
that reasonableness of delay is to be judged by knowledge of the
police at the time of the search, rather than in hindsight).
Based on the information available to the agents at the time, I
find that they acted reasonably by forcibly entering the
apartment ten-to-twelve seconds after knocking and announcing
their presence.  Accordingly, the motion to dismiss is hereby
**DENIED** on this ground.[10]

### C.  **Were Caban's Statements Coerced?**

To determine whether a defendant's statements were coerced
under the Due Process Clause of the Fifth Amendment, a court must

---

[10] The government argues that Caban lacks standing to raise the "knock
and announce" challenge because he neither lived in Apartment #1, nor was he
present when the agents forcibly entered it.  The government asserts that the
purpose of the "knock and announce" requirement is to give occupants the
opportunity to admit police officers, thereby reducing the risk of injury to
occupants and officers alike; to prevent the destruction of property resulting
from forcible entry; and to protect the privacy of occupants by giving them
the opportunity to prepare for the entry of officers.  <u>See, e.g.</u>, <u>Richards</u>,
520 U.S. at 393 n.5 (1997); <u>Sargent</u>, 319 F.3d at 8.  Thus, the argument goes,
the "knock and announce" requirement is designed to protect only persons
physically present when a search warrant is executed.  Since I conclude that
the officers waited a reasonable amount of time between knocking and
announcing and forcibly entering Apartment #1, however, I decline to resolve
the government's standing argument.

consider the totality of the circumstances, including characteristics of the accused.  United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990).  The government bears the burden of proving voluntariness by a preponderance of the evidence.  Id. Ultimately, what the court must decide is whether the will of the defendant was overborne so that the statement was not a free and voluntary act.  See United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998) ("[T]he Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as involuntary.").  Physical evidence derived from involuntary statements must be suppressed, along with the statements themselves.  See United States v. Patane, 124 S.Ct. 2620, 2628 (2004) ("We have repeatedly explained 'that those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'") (quoting Chavez v. Martinez, 538 U.S. 760, 769 (2003)).

    Caban argues that the agents made coercive emotional appeals and promises to Caban when they found him in the basement. First, he notes that the agents asked him to spare his family the indignity of a search of the whole apartment and encouraged him to "be a man" by cooperating.  Second, Caban points to the agents' disingenuous statements that cooperation could result in

misdemeanor charges being filed in state court, rather than felony charges being filed in federal court.

The government responds by first noting the characteristics of Caban that make it unlikely, in their view, that these statements were sufficiently coercive to overbear his free will: Caban was sober and alert during the five-minute exchange, he was read his Miranda warnings, and he was a 25-year-old adult with experience in the criminal justice system.  See, e.g., Jackson, 918 F.2d at 242 (noting the importance of defendant's "very substantial previous experience with the criminal justice system" to the court's finding of voluntariness).

More persuasively, the government correctly notes that the tactics employed here have been sanctioned by the First Circuit. See, e.g., Byram, 145 F.3d at 408 ("[I]t would be very hard to treat as coercion a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original); Jackson, 918 F.2d at 242 (finding statements voluntary despite defendant's claim that he was psychologically coerced by police claims that a family member would be prosecuted).  In light of such precedent, Caban's claim that his statements were coerced must fail. Accordingly, the motion to suppress is **DENIED** on this ground.

IV.  **CONCLUSION**

For the foregoing reasons, Defendant William Caban's motion to suppress the fruits, including statements and physical evidence, of a search conducted pursuant to a warrant at 61 Ceylon Street, Apartment #1, Dorchester, Massachusetts, on October 29, 2003 [docket entry # 22] is **DENIED** in its entirety.

**SO ORDERED.**

**Dated:    July 28, 2005**            **/s/ NANCY GERTNER, U.S.D.J.**